# In the United States Court of Federal Claims

No. 17-1168
Filed: March 25, 2024

---

|  |  |
|---|---|
| ANTOINE FORD, | ) |
|  | ) |
| *Plaintiff*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| *Defendant*. | ) |

---

*Jason W. Manne*, Manne Law Office, Pittsburgh, PA, for Plaintiff.

*Brendan Jordan*, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Assistant Director, and *Alyssa Degner-Lopez*, of counsel, for Defendant.

## **OPINION AND ORDER**

**MEYERS, Judge**.

Antoine Ford claims entitlement to line of duty and disability benefits he claims resulted from his time on active duty in the United States Navy. The Navy does not agree; it denied his claims. When reviewing the military's denial of such benefits, this Court applies the deferential standard of the Administrative Procedure Act, which calls on this Court to defer to the agency unless its decisions are arbitrary, capricious, or otherwise contrary to law. Even under that deferential standard, the Court's review is not a rubber stamp. When, as here, the agency has not fully explained its decision, however, the Court generally remands the matter for the agency to better explain its decisions. That is the result here. It is not clear that the Navy considered certain mandatory factors or fully considered the record in making its determinations. Nor is it apparent that certain presumptions were properly applied. Therefore, the Court remands this case to the Board for the Correction of Naval Records for it to address the issues with its prior decisions.

## I.      Background

Ford enlisted in the Navy on October 28, 1988.  ECF No. 81-3 at 46.[1]  He served in the Navy and Navy Reserve as a Human Resources Officer from 1988 through 2015.  *Id.*  His most recent active-duty deployment was in 2013, when he was stationed at Camp Lemonnier in Djibouti.  ECF No. 86 at 57-58; ECF No. 82-2 at 50. In 2014, while stationed in Djibouti, Ford left Camp Lemonnier on an unauthorized absence.  During the time he was gone, a terrorist group bombed a restaurant in Djibouti.  ECF No. 86 at 58.  Given his absence, Ford was unaccounted for when the Navy mobilized in response to the attack.  After Ford returned to his base, the Navy issued him a written reprimand and a 30-day restriction[2] for his unauthorized absence during an emergency.  *Id.* at 10.  Shortly thereafter, he was returned to the United States and received an adverse fitness report.  *Id.* at 58-59.  Ultimately, the Navy involuntarily retired Ford.  *Id.* at 4.

After his retirement, Ford filed for line-of-duty benefits, disability, and disagreed with the Navy's determination that he was fit for full duty at his retirement.  At issue in the case are Ford's claims of an exaggerated lower-back injury, a shoulder injury, and PTSD-related mental health issues.

### A.    Ford's medical evaluations.

A March 15, 2014, medical report contains Ford's statement that he suffered a ruptured disk in his back in 2008 while doing unit PT.  ECF No. 82-2 at 59.  Ford was later diagnosed with a shoulder impingement on June 13, 2014.  *Id.* at 62-63.  In addition to Ford's shoulder and back issues, Ford's June 23, 2014, post-deployment health assessment states that Ford desired to speak to someone about mental health issues.  *Id.* at 66.

Ford had shoulder surgery in October 2014.  *Id.* at 72.  A November 19, 2014, medical record provides that Ford was on a medical hold for the unfitting condition of post-operative right shoulder pain.  *Id.* at 69.  It further states that Ford was found fit for duty by his orthopedic surgeon and that he had no other unfitting conditions that needed to be addressed while on a MED HOLD.  *Id.*  A November 20, 2014, written summary from Ford's doctor states that Ford was fit for duty and demobilization despite not being medically ready; rather, he was in PRC "B" due to his chronic back pain and recovery from shoulder surgery.  *Id.* at 70.

A November 25, 2014, doctor's note provides that Ford had a Line of Duty ("LOD") for his right shoulder and that Ford was being sent home for an LOD for his back.  ECF No. 82-2 at 77-78.  It also reports that Ford had not been evaluated for his new claim of nightmares, which Ford attributed to his time as a law enforcement officer.  *Id.*  The doctor recommended outpatient care for Ford's shoulder, back, and nightmares, and psychiatric evaluation for PTSD.  *Id.*  Ford

---

[1] For ease of reference, the Court uses the page designations as marked by the Court's CM/ECF system.

[2] The Administrative Record does not explain the extent of Ford's 30-day restriction; the documents simply state that a "30 days restriction was imposed[.]"  ECF No. 86 at 3-4; *see, e.g.*, *id.* at 10; ECF No. 72 at 2; ECF No. 82-2 at 16.

was diagnosed with an adjustment disorder on December 17, 2014.  *Id.* at 81.  Ford was also diagnosed with PTSD by the Veteran's Administration ("VA") in 2015.  *Id.* at 99.

**B.    Ford's LOD determinations.**

Ford was released from active duty on January 29, 2015, and placed on reserve status. ECF No. 82-2 at 25.  In March 2015, Ford applied for LOD benefits.  *Id.* at 185.  On August 5, 2015, the Navy authorized an LOD medical evaluation of Ford.  *Id.* at 191.  Despite the authorization, there was no official LOD finding for Ford's back injury or PTSD.  On December 6, 2015, Ford received a periodic health assessment that found he was not medically ready for duty or cleared for physical readiness testing and that "service member undergoing medical evaluation for LOD – not cleared to participate in PRT."  *Id.* at 87-88.  Also in 2015, the Navy held a Board of Inquiry ("BOI") and recommended that Ford be retired based on his substandard performance, which was approved by the Assistant Secretary of the Navy on February 18, 2016, effective March 1, 2016.  *Id.* at 50-51.

On March 15, 2016, the Navy issued an LOD benefits approval letter for Ford's right shoulder injury for the period from January 2015 through September 14, 2016.  ECF No. 82-2 at 193.  On March 29, 2016, the Navy denied Ford LOD benefits for his back injury and PTSD, finding that the record did not support the claim that Ford incurred the injuries in the line of duty. *Id.* at 196.  The approval for LOD benefits for Ford's shoulder injury came significantly later than required by the LOD regulations, which required an interim LOD determination to be made by the Navy within 30 days of the date the injury was reported.  ECF No. 86 at 90 (DoDI 1241.2, ¶ 6.4.2 (2001)) ("Under regulations prescribed by the Secretary concerned, an appropriate approving authority shall issue an interim line of duty determination in sufficient time to ensure that pay and allowances will commence within 30 days of the date that the injury, illness, or disease was reported . . . .").  Ford never received incapacitation pay for his shoulder injury. ECF No. 86 at 11.

Ford applied to the Board for Correction of Naval Records ( "BCNR") to rescind his retirement so that he could participate in the Line of Duty program and to pursue disability claims.  The BCNR denied his request in a decision dated March 27, 2017, finding that he was properly retired and could not claim any LOD benefits.  ECF No. 82-2 at 7 (citing ECF No. 66-1 at 5-6).  On August 29, 2017, Ford filed a complaint, claiming he was prematurely retired before the Navy acted upon his application for Line of Duty benefits and without properly addressing his opportunity for disability processing.  *Id.*  This Court remanded Ford's case to the BCNR for further consideration in April 2018.  *Id.*

On September 25, 2018, the BCNR issued their second decision in Ford's case.  ECF No. 23.  In it, the BCNR recognized that in its 2017 review, it had "erroneously" found Ford was not eligible for disability benefits because he had been retired for substandard performance.  The BCNR again found that he did not qualify for disability benefits because, based on his medical record, a Physical Evaluation Board ("PEB") would have found him fit for service.  The BCNR also denied Ford's request to rescind his retirement in order to allow him to participate in the LOD program, concluding that he was properly retired despite the Navy's failure to process his LOD application in a timely manner.  But the BCNR did find that because of the late approval, he was never given a chance to apply for the benefits.  Therefore, the BCNR concluded that the

Navy's error created "an injustice warranting . . . partial corrective action." *Id.* at 5.  The BCNR directed the Navy to allow Ford to submit the necessary documents to establish eligibility for retroactive LOD benefits for the 14 months from his release from active duty to his retirement from the Navy Reserve.  The BCNR also moved his official date of retirement from March 1, 2016, to April 1, 2016.  *Id.*

Following the BCNR decision on remand, Ford challenged the Navy's disposition of both his disability and LOD claims.  ECF No. 25.  The parties agreed that the Navy would assign a representative to assist Ford in completing the documentation required for approval of LOD benefits, including medical records and information from civilian employment.  ECF No. 30.  Ford, however, was unable to provide the required information to the Navy's satisfaction and ultimately refused to pursue it further.  ECF No. 82-2 at 8 (citing ECF No. 63-2 at 186-190).  He then obtained legal counsel in October 2019.  In a joint status report, ECF No. 57, the parties agreed that newly appointed counsel would help with the documentation process, however, this effort ultimately proved to be unsuccessful.  On January 22, 2020, the Navy denied Ford's incapacitation benefits request due to lack of documentation, citing "inconsistencies regarding the requested pay and the approved injury" as well as missing civilian earning statements.  ECF No. 82-2 at 8.

Ford then moved for judgment on the administrative record ("MJAR"), challenging the BCNR's determination that he did not qualify for a military disability, and disputed the Navy's denial of his documents for LOD benefits for his shoulder injury as well as the original denial of LOD eligibility for his back and PTSD claims.  ECF No. 68.  On September 30, 2020, this Court issued a reported opinion: (1) granting in part the Government's motion for judgment on the administrative record as to Ford's claims for military disability benefits; (2) denying Ford's motion for judgment on the administrative record; and (3) remanding Ford's claims to the BCNR "to reconsider [Ford's] documentation for his LOD shoulder injury, as well as his claim for wrongful denial of his LOD application for back and PTSD injuries."  *Ford v. United States*, 150 Fed. Cl. 220, 225 (2020); ECF No. 72.

Ford then filed for reconsideration of the BCNR's decision denying military disability benefits in addition to submitting evidence in support of the remanded LOD benefits issue, arguing that "he was entitled to a disability retirement based upon the aggravation of his active duty injuries during his subsequent period of reserve service."  ECF No. 89 at 6.  The BCNR issued its remand decision on March 9, 2021.  ECF No. 78.  The BCNR determined that Ford was not entitled to LOD benefits based on his right shoulder, PTSD, or back condition, reasoning that Ford "failed to substantiate [his] inability to perform [his] civilian duties due to [his] right shoulder or any of the claimed conditions."  *Id.* at 4.

Dissatisfied with the BCNR's decision, Ford filed a new MJAR.  ECF No. 89.  Regarding his back injuries, the Court was unable to locate anything in the record to substantiate the BCNR's conclusion—namely, that the VA rated Ford's back injury a 20% disability on his entry to active duty when he went on active duty in 2013, and at 20% upon his release from active duty.  Therefore, the Court remanded the case to the BCNR with instructions to "explain the basis for its conclusion that the Plaintiff [Ford] received a 20% VA disability rating in 2013 for lumbar spine stenosis and disc narrowing that was suspended pending his active duty service."  ECF No. 101.  In its reconsideration on January 6, 2022, BCNR acknowledged that its previous

4

conclusion that Ford received a 20% rating for his back in 2013 was erroneous yet held that it "continued to find insufficient evidence of probable material error or injustice," and therefore affirmed its previous decision denying Ford relief. ECF No. 103 at 1.

## II.    Discussion

### A.    Standard of review

The Court reviews the BCNR's January 6, 2022, decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006) (citing *Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003) (en banc)); *see also Barnes v. United States*, 473 F.3d 1356, 1361 (Fed. Cir. 2007) (quoting *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005)) ("We apply the same standard of review as the United States Court of Federal Claims, which means 'we will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'"). The Court may set aside the BCNR's decision if it "offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Filo v. United States*, 154 Fed. Cl. 17, 22 (2021) (quoting *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)).

"Although courts afford great deference to the decisions of boards for the correction of military records, that deference is not absolute. Correction boards are obligated to 'examine relevant data and articulate a satisfactory explanation for their decisions.'" *Rominger v. United States*, 72 Fed. Cl. 268, 273 (2006) (citation omitted). To prevail, Ford "must show by 'cogent and clearly convincing evidence' that 'the action of the military is arbitrary, capricious, unsupported by substantial evidence or contrary to applicable statutes or regulations.'" *Johnson v. United States*, 97 Fed. Cl. 267, 270 (2011) (citing *Stine v. United States*, 92 Fed. Cl. 776, 791 (2010)), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011).

Pursuant to RCFC 52.1, a motion for judgment upon the administrative record requires the Court to determine whether "the plaintiff has met [his] burden of proof to show that the decision was not in accordance with law." *Melendez Camilo v. United States*, 89 Fed. Cl. 671, 677 (2009) (citation omitted), *aff'd*, 642 F.3d 1040 (Fed. Cir. 2011). The Court must complete a "trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

### B.    Line of Duty Findings

Central to Ford's disability retirement and LOD claims is the issue of whether Ford's injuries were incurred or aggravated in the line of duty. *See* SECNAVINST 1850.4E, Enc. (3),

¶ 3301[3]; SECNAVINST 1850.4E, Enc. (3), ¶ 3406[4]; 37 U.S.C. § 204(g)(1)(A)[5]; DoDI 1241.2, ¶ 6.2.1.1.1 (2001)[6]; DoDI 1241.2, ¶ 6.2.1.2.1 (2001)[7]; DoDI 1241.2, ¶ 6.6.3.2 (2001).[8]  Both parties agree Ford's shoulder injury was incurred in the line of duty.  The parties dispute whether Ford's back injury and PTSD are LOD injuries.

1.   Line of Duty Presumption

The Navy presumes that injuries discovered on active duty were incurred in the line of duty.  SECNAVINST 1770.3D, ¶ 6(k)(l) ("[I]t 'shall be presumed that an illness, injury, or disease was incurred in the Line of Duty[.]'"); SECNAVINST 1850.4E, Enc. (3), ¶ 3410 ("Any disease or injury discovered after a member enters active military service . . . is presumed to have been incurred 'in the line of duty.'  Clear and convincing evidence is required to overcome this presumption.").  The first question, therefore, is whether this presumption applies in this case.  According to Ford, the "regulations governing [the] disability retirement . . . and LOD benefit claim[s]" required the BCNR to presume Ford's back injury and PTSD were LOD injuries.  ECF No. 89 at 19-20.   The Government contends that there is no presumption a condition is LOD if it existed prior to when a reservist entered "active service and the condition remains static during the reservist's time of service."  ECF No. 90 at 11 (citing SECNAVINST 1770.3D).

According to Ford, he suffered his back injury in the line of duty as "the military medical record shows an initial in-service back injury in 2008."  *Id.* at 21 (citing ECF No. 86 at 31).  Although Ford subsequently went on inactive duty before coming back to active duty in 2013,

---

[3] "The sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating because of disease or injury *incurred or aggravated while entitled to basic pay*."  ECF No. 86 at 184 (emphasis added).

[4] "A member is not eligible to receive benefits . . . for an unfitting physical disability if: . . . the disease or injury was incurred Not In Line Of Duty."  ECF No. 86 at 190.

[5] "A member of a reserve component of a uniformed service is entitled to the pay and allowances provided by law or regulation for a member of a regular component of a uniformed service of corresponding grade and length of service whenever such member is physically disabled as the result of an injury, illness, or disease incurred or aggravated—

(A) in line of duty while performing active duty[.]"  37 U.S.C. § 204(g)(1)(A).

[6] "A Reserve component member who is unable to perform military duties, as determined by the Secretary concerned, due to an injury, illness, or disease *incurred or aggravated in the line of duty* . . . ."  ECF No. 86 at 88 (emphasis added).

[7] "A Reserve component member who is able to perform military duties, as determined by the Secretary concerned, but demonstrates a loss of earned income as a result of an injury, illness, or disease *incurred or aggravated in the line of duty* . . . ."  ECF No. 86 at 88 (emphasis added).

[8] "A Reserve component member on active duty . . . who incurs or aggravates an injury, illness, or disease *in the line of duty* . . . ."  ECF No. 86 at 92 (emphasis added).

6

Ford argues that "prior service impairments that recur during later service, such as [Ford's] back injury, 'normally should be considered' LOD." *Id.* at 20 (citing SECNAVINST 1850.4E, Enc. (3), ¶ 3409).[9]  Thus, argues Ford, the BCNR was required to, yet failed to presume his back injury was incurred in the line of duty, and the BCNR's conclusion to the contrary is not supported by substantial evidence.  The BCNR, however, relied on a medical advisor's opinion that "Dr. Belcher's medical opinion notes that examination of [Ford's] back is consistent with a 'pre-existing, recurrent low back pain, with no significant red flags indicating acute injury.' Such an assessment is inconsistent with an acute basketball injury."  ECF No. 96 at 4 (citing ECF No. 86 at 13).

Ford acknowledges that an advisory opinion written for the BCNR concludes his back injury was "a pre-existing chronic denigration condition with no record of acute exacerbation beyond the normal progression."  ECF No. 86 at 14.  Ford, however, argues the BCNR did not rely on the opinion, and so the Government cannot use it to uphold the BCNR's decision on appeal.  ECF No. 89 at 21 n.11 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 169 (1962)).

The BCNR's holding that Ford's back injury is not a LOD injury was arbitrary and capricious and not supported by substantial evidence on the record.  As Ford points out, for retirement disability analysis, there is a presumption that an injury discovered after a member enters active service is presumed to have been incurred in the line of duty.  Such presumption can only be overcome by clear and convincing evidence.  SECNAVINST 1850.4E, Enc. (3), ¶ 3410.  The record demonstrates that Ford was on active duty in 2008.  *See* ECF No. 86 at 32.  The record also demonstrates that Ford incurred a back injury playing basketball while on active service in 2008.  *See id.* at 31.  It matters not that Ford subsequently left active duty and then came back on active duty in 2013.  SECNAVINST 1850.4E, Enc. (3), ¶ 3409 provides that "[a]ny medical condition incurred or aggravated during one period of service or authorized training in any of the Armed Forces that recurs or is aggravated during later service or authorized training, regardless of the time between, normally should be considered incurred or aggravated in the line of duty[.]"  ECF No. 86 at 193.  Thus, pursuant to SECNAVINST 1850.4E, Enc. (3), ¶¶ 3409-10, Ford's back injury is presumed to have incurred in the line of duty.

Additionally, Ford's back injury is presumed to have been aggravated in the line of duty.  As the BCNR acknowledged, the BCNR erroneously found that Ford was issued a 20 percent disability rating from the VA for a Lumbar Stenosis and Degenerative Disc Disease condition prior to Ford's mobilization in 2013 that remained static.  Instead, Ford had a previous 10 percent rating for the condition prior to Ford's active service in 2013 which subsequently increased to 20 percent.  Even more, Ford's medical records show a visit in March 2014 where Ford complained of turning his back the wrong direction which caused the pain in his back to radiate to his thighs.  ECF No. 63-1 at 381.  The comments from that visit conclude with "exacerbation of chronic issue," indicating that the provider felt it was an aggravation of the underlying injury.  *Id.*

---

[9] Ford also argues that "[t]he fact that the LCDR also had a Department of Veterans Affairs (DVA) rating for his back injury is relevant because it signifies that the underlying back injury was determined to be LOD by that agency after investigation. 38 C.F.R. § 3.30." ECF No. 93-2.

The Government's arguments to the contrary are not convincing.  For example, the Government contends Ford was equivocal as to the source of his back issues because as he states his back pain *may* have originated in 2008.  *Id.* (citing ECF No. 86 at 26) (emphasis added). That does not carry the burden of clear and convincing evidence that Ford's injury was not incurred in the line of duty.  Neither does the argument that, although Ford's rating for lumbar spine stenosis and disc narrowing went up from 10% to 20%, the record contains a medical opinion stating that Ford has a chronic condition "with no record of acute exacerbation beyond the normal progression."  ECF No. 90 at 11-12 (citing ECF No. 86 at 14).  If anything, that shows competing narratives from medical advisors—not definitive proof of a prior condition. Lastly, the Government's reliance on a November 14, 2014, fit for duty determination that concluded that his "back condition was preexisting and not incurred in the line of duty" doesn't carry the day either.  *Id.* at 12 (citing ECF No. 86 at 6).  The Government's later medical advisor's opinion appears to contradict the contemporaneous medical reports showing a worsening of Ford's back pain and symptoms.  Thus, the presumption that Ford's back injury was incurred in the line of duty has not been rebutted by clear and convincing evidence.  The Court, therefore, holds that the BCNR's holding that Ford's back injury was neither incurred or aggravated in the line of duty was arbitrary and capricious.

### 2.  PTSD Determination

The BCNR relies on the VA determination that Ford's PTSD was not service connected as dispositive of the LOD determination. ECF No. 78 at 4.  As Ford explained, however, the standards for service connection under the relevant VA regulations are different from those governing a finding of LOD.  For service connection under the VA standards, the veteran must show "credible supporting evidence that the claimed in-service stressor occurred."  38 C.F.R. § 3.304.  Under the relevant LOD standards, the claimant need only show the injury was incurred in the line of duty.  SECNAVINST 1770.3D instructs that a line-of-duty investigation "***must*** be completed when it is questionable of whether the injury, illness or disease was incurred or aggravated in the LOD."  SECNAVINST 1770.3D (emphasis added).[10]  That did not happen in this case.  Instead, the BCNR presumed the opposite—that the VA's finding of a lack of evidence meant that Ford's PTSD was not incurred in the line of duty.  But that is not the logical result from the two different standards.  Under the VA standard, the veteran is responsible for providing the supporting evidence.  "To establish a right to compensation for a present disability, a veteran must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service—the so-called 'nexus' requirement." *Fagan v. Shinseki*, 573 F.3d 1282, 1286 (Fed. Cir. 2009) (internal quotations omitted).[11]  For the LOD determination, on the other hand, the BCNR has the burden to

---

[10] SECNAVINST 1770.3D also instructs the Benefits Issuing Authority (here, the BCNR) to "[d]irect LOD Determination cases to the PEB when a service member's fitness for continued naval service is questionable."

[11] Although the question is not squarely before the Court, the VA's conclusions, which the BCNR adopted, present some logical holes.  If Ford was disciplined and later released from active duty based on his absence on the day a terrorist attack took place, and then Ford claims that attack is his in-service stressor, ECF No. 63-2 at 297, there should be little difficulty for the

investigate injuries that could go either way.  Finding that Ford did not carry his burden for the VA's purposes does not mean that the BCNR gets to skip its own investigation and use the VA's finding as dispositive without even opening an investigation, which could have produced a different result.

Further, as Ford notes the BCNR's medical advisor remarked that while the PTSD diagnosis "was not in dispute," there was "insufficient evidence that this diagnosis prevented the applicant from performing the duties of a Human Resources Officer[.]"  ECF No. 66-2 at 66.  It seems inconsistent to say that Ford's diagnosis didn't impact his service as a human resources officer, but then also say that Ford didn't incur the PTSD during his service.  In other words, if the PTSD didn't impact his service as a human resources officer, he must have had PTSD at the time of his service.

That said, before this Court, it is not clear that the PTSD diagnosis is undisputed.  The Government and the BCNR's medical advisors seem to fault Ford for not receiving treatment for mental health conditions.  ECF No. 82-2 at 23 ("The applicant was not seen for mental health concerns within the DoD Health System."); ECF No. 90 at 16 ("Taken together, LCDR Ford was not seen for mental health issues while on deployment, received intermittent, short-lived, and insubstantial treatment in the VA (and perhaps civilian) system after his return, and was not recommended for behavioral or mental health clinic intervention."); *id.* at 15 ("[T]here is no documentation that [Ford] . . . was ever diagnosed with PTSD.").  But it is clear from the record that Ford requested evaluation and treatment numerous times.  *See* ECF No. 82-2 at 66 (June 23, 2014); ECF No. 63-1 at 51 (November 19, 2014); ECF No. 63-1 at 56 (November 25, 2014); ECF No. 63-1 at 59 (December 17, 2014).  And it is clear from the record that the VA *did* diagnose Ford with PTSD.  ECF No. 86 at 36 ("DSM-V DIAGNOSES: PTSD" on April 23, 2015); ECF No. 82-2 at 101 ("Veteran's score of 42 is consistent with a PTSD diagnosis" on February 23, 2015); ECF No. 82-2 at 116 ("Mental Diagnosis #1: PTSD" on December 3, 2015). While it is true these diagnoses were from the VA, Ford did seek treatment from DoD to no avail.  DoD cannot fail to provide someone care and then claim that the lack of a diagnosis establishes a lack of injury.

Regardless, this Court's predecessor clearly outlined that PTSD and similar conditions are "difficult . . . to diagnose and may not be discovered for a number of years after the [stressor]."  *Walters v. United States*, 358 F.2d 957, 962 (Ct. Cl. 1966); *see also Hassay v. United States*, 150 Fed. Cl. 467, 480 (2020) ("In fact, as the Department of Defense has recently recognized, because disorders like PTSD were until recently not well understood, they are often not diagnosed until many years after they manifest themselves.").  Therefore, the BCNR's reliance on Ford's supposed lack of treatment misses the mark.

Indeed, the record supports at least the need for an investigation to determine whether Ford's PTSD was incurred in the line of duty, and if it was, what impact his PTSD has on his

---

BCNR to verify such an event took place.  But the VA stated that it was "unable to verify any of [Ford's] in-service stressors[.]"  ECF No. 63-1 at 79.  While that may be true for the VA, the BCNR's records are replete with mentions of the Djibouti incident.  ECF No. 78 at 1.

ability to perform his job duties.[12]  As noted throughout the record, the BCNR's own doctors and advisors largely did not dispute Ford's diagnosis.  Additionally, Ford was diagnosed with PTSD by both VA and outside providers.  *See, e.g.*, ECF No. 82-2 at 23, 99-101.  In fact, the VA provided Ford care for his PTSD.  ECF No. 90 at 17.  As the Kurta Memo[13] instructs, the BCNR must give liberal consideration to mental health conditions like PTSD.  That means with the evidence in the record, the BCNR should have at least conducted its own investigation.  *Cf.* Hassay, 150 Fed. Cl. At 482 ("The Board did not explain its reason for determining that—at the time Dr. Killian examined him—Mr. Hassay's 'mental fitness to continue naval service' was not 'questionable.'") (internal citations omitted).  At the end of that investigation, it is entirely possible that Ford would still be found to be ineligible.  On this record, however, it is impossible to determine.

## C.    Disability Retirement Claim

"Generally, each branch of the military is required to develop a military disability retirement procedure, including evaluating service members' medical conditions, their ability to continue service, and their eligibility for military disability retirement pay or severance payments."  *Kelly v. United States*, 69 F.4th 887, 889 (Fed. Cir. 2023) (citing 10 U.S.C. § 1216(a)).  To qualify for benefits, a service member determined "unfit to perform the duties of the member's office, grade, rank, or rating because of a physical disability" must have at least 20 years of service *or* a disability rating greater than 30%.  *Id.* (citing § 1201(a)).  The relevant regulation in Ford's case is Secretary of the Navy Instruction ("SECNAVINST") 1850.4E, which defined the applicable standards and procedures used by the Navy to adjudicate disability cases at the time of Plaintiff's separation.  Pursuant to the instruction, "the Secretary of the Navy designated the Physical Evaluation Board ("PEB") as the entity responsible 'to act on behalf of the [Secretary of the Navy] to make determinations of fitness to continue naval service, entitlement to benefits, disability ratings, and disposition of service members referred' to it from the Navy."  *Id.* (citing SECNAVINST 1850.4E at 2-3).

In assessing whether a service member is eligible for disability retirement, SECNAVINST 1850.4E provides that:

> The sole standard to be used in making determinations of physical
> disability as a basis for retirement or separation is unfitness to
> perform the duties of office, grade, rank or rating because of
> disease or injury incurred or aggravated while entitled to basic pay.
> Each case is considered by relating the nature and degree of
> physical disability of the member to requirements and duties that

---

[12] One provider that evaluated Ford concluded that he "would have significant difficulty handling most full-time job settings[.]"  ECF No. 63-2 at 296.

[13] The Kurta Memo was released by Under Secretary of Defense Anthony Kurta in 2017 and was entitled: "Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment."  *Hassay*, 150 Fed. Cl. at 483.

member may reasonably be expected to perform in his or her
office, grade, rank or rating.

*Id.*, encl. (3), ¶ 3301.

Pursuant to the instruction, the PEB is to take into account the following four considerations in determining whether a service member can reasonably perform his or her duties: (1) common military tasks, *i.e.*, whether the member is unable to reasonably perform routine assignments expected of his or her office, grade, rank or rating; (2) physical readiness/fitness tests, *i.e.*, whether the member's condition prohibits him or her from taking all or part of physical readiness/fitness tests; (3) deployability, *i.e.*, whether the member's condition prevents him or her from being positioned outside the continental United States for an unspecified amount of time; and (4) special qualifications, *i.e.*, whether the member's condition causes the loss of any specialized qualifications. *Id.* ¶ 3304. Notably, the standards utilized for a disability determination and for considering common military tasks are effectively interchangeable: both assess whether the member can reasonably perform the duties of his or her office, grade, rank, or rating. *See id.* ¶¶ 3301, 3302.a, 3304.a(1). Therefore, a finding that a service member cannot perform his or her common military tasks is dispositive to the ultimate question of the member's unfitness. By contrast, the considerations of deployability, physical fitness test, and special qualifications cannot be used individually as the sole basis for a finding of unfitness. *See id.* ¶ 3307.

"[I]n assessing service member fitness, including the circumstances of referral [to the DES]," SECNAVINST 1850.4E instructs the PEB to "[c]onsider all relevant evidence," *id.* ¶ 3303, and make a finding of fitness or unfitness based on a preponderance of the evidence. *Id.* ¶ 3306.b. Although Ford was never referred to the PEB for evaluation before the Navy discharged him, the standard and related considerations established in SECNAVINST 1850.4E, as discussed above, guide the Court in evaluating the propriety of the BCNR's decision-making process. *See Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991) (recognizing the BCNR "is competent to make a disability determination in the first instance"); *Beckham v. United States*, 392 F.2d 619, 622 (Ct. Cl. 1968) (recognizing the BCNR, "like other administrative bodies, is bound by its own regulations").

Ford argues that the BCNR's decision to deny his military disability retirement claim for his back, shoulder, and PTSD injuries was arbitrary and capricious for the following three reasons: (1) the BCNR failed to apply the mandatory criteria for determining disability fitness set forth in SECNAVINST 1850.4E, Enc. (3), ¶ 3304; (2) the BCNR's decision is not supported by substantial evidence on the record; and (3) the BCNR did not consider the overall effect of all of his disabilities. ECF No. 89 at 23.

### 1. Mandatory Criteria

Ford argues the BCNR failed to consider the mandatory criteria set forth in SECNAVINST 1850.4E, Enc. (3), ¶ 3304 to determine whether Ford was "by reason of unfitness unable to perform the duties of his office, grade, rank, or rating." ECF No. 89 at 24 (quoting SECNAVINST 1850.4E, Enc. (3), ¶ 3301). These factors include a consideration of Ford's

common military tasks, ability to take physical readiness tests, deployability, and loss of special qualifications. *Id.* Ford argues that in *Kelly v. United States*, 157 Fed. Cl. 114 (2021), and *Hassay v. United States*, 150 Fed. Cl. 467 (2021), this Court held the failure to weigh these mandatory factors to determine whether one is unfit was arbitrary and capricious. ECF No. 105 at 1-3. He argues that had the BCNR considered the necessary criteria, it would have weighed in favor of a finding of unfitness. ECF No. 89 at 24-27.

Indeed, the record does not show that the BCNR applied the mandatory criteria. In *Kelly v. United States*, this Court held that "SECNAVINST 1850.4E does not define the level of detail required by the common-military-task consideration." 157 Fed. Cl. at 126 (emphasis omitted) (quoting SECNAVINST 1850.4E, Encl. (3), ¶ 3301)). But the "overall standard used for determining disability (which is essentially the same standard for considering common military tasks) shows that a mere review of whether a member was adequately performing duties—regardless of what those were—immediately before separation is not sufficient." *Id.* The standard requires "relating the nature and degree of physical disability of the member to the requirements and duties that member may reasonably be expected to perform in his or her office, grade, rank or rating" and "[a] disability determination must therefore connect the review of a member's performance of duties with a consideration of the duties that are within the member's common military tasks." *Id.*

Similarly, in *Nyan v. United States*, the Court held that substantial evidence did not support the Navy's determination that a servicemember's lower back pain and chronic migraines did not render him unfit for continued service. 153 Fed. Cl. 234 (2021), *opinion vacated in part on reconsideration*, 154 Fed. Cl. 463 (2021).[14] The Court reasoned that "the record did not contain substantial evidence to support the [Informal Physical Evaluation Board]'s finding that [the service member] was not unable, 'due to physical disability . . . to reasonably perform the duties of his[ ] office, grade, rank or rating[,]'" and that the "decision documents included no findings regarding what duties a Hospital Corpsman at the E4 grade is expected to perform—an essential element of the fitness determination." *Nyan v. United States*, 154 Fed. Cl. 463, 465 (2021); *see also O'Hare v. United States*, 155 Fed. Cl. 364, 375 (2021) (distinguishing itself in part from *Nyan* on the grounds that the BCNR had gone through the specific duties of the servicemember in its fitness analysis as opposed to the BCNR's analysis in *Nyan*).

The record is devoid of any attempt by the BCNR to apply the criteria set forth in SECNAVINST 1850.4E, Encl. (3), ¶ 3304 to determine whether Ford's injuries rendered him unfit to perform his duties as a Naval human resources officer. Instead, the Government argues that the BCNR is presumed to review all the evidence and that its decision was nonetheless supported by substantial evidence. But, as the regulations make clear, such a determination without considering the factors set forth in SECNAVINST 1850.4E, Encl. (3), ¶ 3304 is insufficient. Ford argues that his common military tasks involved prolonged sitting and typing, lifting and moving equipment, and that due to his injuries he could not reach overhead, sit for

---

[14] On reconsideration, the court vacated its prior order and judgment "only insofar as the Court directed the Navy to award Mr. Nyan a disability retirement[.]" *Nyan*, 154 Fed. Cl. at 467. In other words, the order was only changed "on a narrow issue of the appropriate remedy." *Id.* at 464.

prolonged periods, lift heavy objects, or perform the required PRT twice a year.  AR II, 718-19.
The BCNR, however, made no such assessment.  Similarly, the BCNR failed to consider the
overall effect of Ford's disabilities as required by SECNAVINST 1850.4E, Encl. (3), ¶ 3304(f).
While the BCNR may be presumed to have reviewed all the evidence, that presumption does not
mean the BCNR fulfilled its duty to apply the relevant regulations to the evidence.  Because the
record does not reflect such an analysis, the Court must conclude that the BCNR failed to do so.

### 2. Evidence in Record as a Whole

In addition to the BCNR's failure to consider the mandatory fitness factors, Ford
contends the BCNR's decision is not supported by substantial evidence on the record as a whole.
ECF No. 89 at 28-30.  He argues that the BCNR's reliance on favorable fitness reports to
conclude he was fit for duty was erroneous because his last favorable fitness report took place in
January 2014, which predated his shoulder and back injuries.  Thus, these fitness reports are not
probative of his fitness to perform his duties.  Additionally, contrary to the BCNR's decision,
Ford's June 2014 fitness report was also unfavorable.  It indicates mere acceptability in a limited
job in which Ford required medication.  ECF No. 89 at 28-29.

Relatedly, Ford asserts that the record shows that he was limited in his physical abilities
due to his active-duty injuries during his period of reserve service.  A September 28, 2015, DVA
doctor's report summarizes Ford's injuries and, according to Ford, demonstrates he was not fit
for active duty.  ECF No. 89 at 34; ECF No. 81-2 at 24.  The BCNR, however, maintained that
the November 14, 2014, determination finding Ford "fit for full duty" was the "best medical
evidence in determining [Ford's] medical fitness at the time of [his] discharge."  ECF No. 86 at
6.  But that misses the point for two reasons.  First, the November 14, 2014 notes seem to only
provide insight on his right shoulder injury—not the other complaints.  The note was written by
an orthopedic surgeon on a post-op form describing the surgery and treatment plan for the right
shoulder, and apparently the right shoulder exclusively.  ECF No. 86 at 34.  Even more, days
later, on November 19, 2024, the characterization of "fit for full duty" was narrowed to
specifically cover his shoulder and was clarified to provide time to "allow for more healing."
ECF No. 82-2 at 77 ("fit for duty on [right] shoulder").  Second, the notes are dated in November
2014 and are thus not the best evidence of his fitness in January 2015, when Ford was released
from active duty, nor at the time of his retirement in March 2016.  ECF No. 105 at 3-4.
Therefore, the BCNR's reliance on the November 14, 2014 note exclusively—without regard to
Ford's other medical examinations—is not sufficient.

Ford also takes issue with the BCNR's reliance on his attending law school following his
release from active duty, because the BCNR made no attempt to determine if there is any
similarity between the physical demands of attending law school and those of a Naval Human
Resources Officer.  There is nothing in the record indicating that the physical and mental
requirements of a Naval Human Resources Officer are similar to those required to attend law
school.  A mere assumption that they are similar without an explication of the requirements of a
Naval Human Resources Officer is insufficient.  In any event, the Court fails to see how Ford's
law school attendance is indicative of his fitness, given that he eventually had to leave law
school due to his injuries.  ECF No. 82-2 at 118.  The BCNR does not address this aspect of the
law school story.

In sum, the record does not show that the BCNR reviewed all the evidence in the record in making its decision.

### 3.   Overall Effect of All Disabilities

Ford next argues that the BCNR failed to consider the overall effect of all his disabilities as required by SECNAVINST 1850.4E, Enc. (3), ¶ 3304(d).[15]  ECF No. 89 at 27.  Additionally, Ford argues that the BCNR should have "looked at Enclosure 8 of SECNAVINST 1850.4E" which "lists those conditions which 'normally are cause for referral' to the Physical Evaluation Board (PEB) for a disability determination."  ECF No. 93 at 6.  Ford argues that he has "several qualifying conditions under the enclosure[,]" including a herniated disk, PTSD, and use of a CPAP machine.  *Id.*

Because of the Court's conclusions on Ford's first two arguments, it need not address this argument in depth.  Rather, "[i]t is a well-established principle of administrative law that, upon a finding that an agency 'decision of a matter that statutes place primarily in agency hands' is unsupported by substantial evidence, reviewing courts should generally remand the case to the agency."  *Nyan*, 154 Fed. Cl. at 467 (citing *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002)).  Additionally, "[f]urther, restraint seems particularly appropriate in military disability cases because of the broad discretion afforded the military when determining whether service members are fit for duty."  *Id.* (collecting cases).  The Court, therefore, remands this case to the BCNR for further review of the fitness question with instructions to apply the mandatory fitness criteria set forth in SECNAVINST 1850.E.

### D.   Remaining Claims

The Court defers ruling on the remaining matters until the BCNR concludes its remand and can determine Ford's eligibility for any back-pay, incapacitation pay, or loss-of-civilian-income pay.  Specifically, the Court instructs the BCNR to consider what, if any, effect Ford's PTSD and back injury had on his ability to perform his normal duties.  *See, e.g.*, ECF No. 63-2 at 293 ("Is this member able to perform his/her military duty in a light duty status?" marked "No"); ECF No. 63-2 at 296 (PTSD screening/diagnosis concluding that Ford "would have significant difficulty handling most full-time job settings and might only be able to work in a situation where he had minimal interaction with others.").

### III.   Conclusion

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Ford's Motion for Judgment on the Administrative Record, ECF No. 88, and **DENIES** the Government's Motion for Judgment on the Administrative Record, ECF No. 90.

---

[15] SECNAVINST 1850.4E, Encl. (3), ¶ 3304(d) provides that: "A member may be determined Unfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the member to be referred into the DES or be found Unfit because of physical disability."  ECF No. 86 at 186.

The Court **REMANDS** this case to the BCNR for 4 months **until July 23, 2024,** for further consideration consistent with this opinion.  Pursuant to Rule 52.2(b)(1)(D), the Government shall file a status report on June 21, 2024, updating the Court on the status of the remand.  This case will be **STAYED** during the remand.

Because this case is being remanded, the Court **DENIES-AS-MOOT** Ford's Motion to Amend/Correct the Administrative Record, ECF No. 87.  If Ford wishes to include more documents in the record, he may do so on remand.

The Clerk of Court is **DIRECTED** to send a certified copy of this Order to the Board for Correction of Naval Records at the following address:

Board for Correction of Naval Records
Elizabeth A. Hill, Executive Director
701 South Courthouse Road
Building 12, Suite BE140
Arlington, Virginia 22204-2490

It is so ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge
