# In the United States Court of Federal Claims

No. 17-1168
Filed: April 30, 2026

|  |  |
|---|---|
| ———————————————— ) | |
| ANTOINE FORD, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| *Defendant.* ) | |
| ———————————————— ) | |

*Jason W. Manne*, Manne Law Office, Pittsburgh, PA, for Plaintiff.

*Brendan David Jordan*, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., and *Douglas Thomas Hoffman*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## OPINION AND ORDER

Antoine Ford served as a human resources officer in the United States Navy and Navy Reserve. He claims that, during his active-duty service, he injured his back, his shoulder, and developed post-traumatic stress disorder ("PTSD"). He asserts several arguments for compensation based on the Navy's handling of his separation.

First, he claims that he was improperly released from active duty. In Ford's opinion, he was not fit for duty at the time he was separated and returned to the Navy Reserve, especially given his restricted duty status for his shoulder post-operation. But Ford was held on active duty following his shoulder surgery until his surgeon found him fit for duty and demobilization, as required by applicable military instructions. And the Navy explained that this "fit for duty" determination occurred only two months prior to Ford's release from active duty.

Second, Ford claims entitlement to incapacitation pay for his shoulder injury, back injury, and supposed PTSD. The Navy agreed to consider Ford's claim for incapacitation pay for his shoulder injury and gave him the opportunity to provide documentation of lost civilian income. Ford, however, failed to provide sufficient documentation, and the Navy reasonably denied his claim. The Navy also explained why Ford's back injury and PTSD did not qualify for incapacitation pay because they were not incurred or aggravated while he was on active duty.

Third, Ford claims entitlement to disability benefits due to his shoulder injury, back injury, and supposed PTSD. The Navy, however, thoroughly examined Ford's record and

concluded that there was insufficient evidence to establish that any of his claimed injuries prevented him from performing his duties.  Thus, the Navy did not find Ford to be disabled.

Finally, Ford complains that the Navy's denial of an in-person hearing violated his due process rights and that he should be allowed discovery into the process the Navy followed in denying his claims.  Both arguments fail.  The Navy was not required to provide Ford with an in-person hearing, and the Navy explained its rationale for not holding such a hearing.  And Ford has not shown that discovery is necessary or proper.

Because the Navy considered the evidence under the proper standard and provided a reasoned explanation for its decisions, Ford has failed to demonstrate that the denial of his claims was arbitrary or capricious.  As a result, the court denies Ford's motion for judgment on the administrative record and grants the Government's cross-motion for judgment on the administrative record.

## I.      Background

The court most recently heard this case in 2024.  *See Ford v. United States (Ford II)*, 172 Fed. Cl. 300, 300–06 (2024).  There, the court considered two issues: (1) whether the Board of Correction of Naval Records' ("BCNR") finding that the back injury and PTSD were not in the line of duty ("LOD") was arbitrary and capricious; and (2) whether the BCNR's finding of fitness at the time of retirement—rendering Lieutenant Commander Antoine Ford ineligible for disability retirement—was arbitrary and capricious.  As the court held, the BCNR's LOD determinations were arbitrary and capricious because of indications that injuries may have been discovered while Ford was on active duty.  *Id.* at 308–11.  The court also held that the BCNR's disability determinations were arbitrary and capricious because it was unclear from the record whether the BCNR (or anyone else at the Navy) applied the mandatory fitness criteria for disability determinations.  *Id.* at 311–13.  Consequently, the court remanded this case to the BCNR for further consideration.  *Id.* at 314.  The court also deferred on Ford's eligibility for any back pay, incapacitation pay, or loss-of-civilian-income pay.  *Id.* at 313.

The BCNR has issued a new decision on Ford's claims, and Ford challenges this decision.  Because *Ford II* provides much of the procedural and factual background of this case, the court's recitation of the facts below focuses on the post-*Ford II* developments.

### A.      Career in the U.S. Navy

Ford served twenty years and ten months of qualifying service.  *Ford v. United States (Ford I)*, 150 Fed. Cl. at 220, 222 (2020).  He served in both the Navy and Navy Reserve as a Human Resources Officer until 2015.  ECF No. 82-2 at ARII 0530.[1]  Ford received honorable

---

[1] Because there have been various additions to the administrative record generated over the life of this case, the Parties refer to ARI, ARII, and ARIII.  The record thus spans multiple docket entries.  For ease of reference, the court refers to both the ECF No. and the AR citation (e.g., ECF No. 82-2 at ARII 0492) when citing to the administrative record.

characterizations of service and had no documented incidents—until 2014.  ECF No. 135 at ARIII 0029–45; *see, e.g.*, ECF No. 66-1 at ARI 1132.

Ford began his most recent deployment to Camp Lemonnier, Djibouti, in 2013.  ECF No. 86 at ARII 0055; ECF No. 82-2 at ARII 0534.  There, he served as Installation Business Manager and Security Manager, "[p]rovid[ing] base operating support services for 27 tenant commands."  ECF No. 66-2 at ARI 1429.  In a February 6, 2014, fitness report covering this deployment, Ford earned positive performance reviews, an early promotion recommendation, and a 4.0 trait average.  ECF No. 66-3 at ARI 1957.  But things changed when Ford went absent without leave.  During Ford's absence, there was a terrorist bombing in Djibouti City.  ECF No. 86 at ARII 0041, 0056.  Following the attack, the Navy conducted a roll call to ensure that all personnel were present and accounted for.  Ford was not there—he was in Ethiopia.  *Id.*  His absence led to a written reprimand and a thirty-day restriction.  *Id.*  The Navy then returned Ford to the United States where he received a negative fitness report that identified performance issues.  *Id.*  He was released from active duty on January 29, 2015, and placed in reserve status.  ECF No. 66-3 at ARI 1957; ECF No. 82-2 at ARII 0509.  From there, the Navy held a Board of Inquiry ("BOI") and recommended Ford be retired for substandard performance.  ECF No. 66-3 at ARI 1957; ECF No. 82-2 at ARII 0534–35.  His involuntary retirement was approved and made effective on March 1, 2016.[2]  ECF No. 82-2 at ARII 0534–35.

After his retirement, Ford filed for LOD benefits and disability benefits.  *Ford II*, 172 Fed. Cl. at 304.  He also expressed disagreement with the Navy's decision that, at the time of retirement, he was fit for full duty given his alleged back, shoulder, and PTSD-related injuries.  *Id.*

### B.    History of injuries

LCDR Ford claims three separate health issues relating to his time serving in the Navy: (1) his back, (2) his shoulder, and (3) his mental health.

Ford complained of various pains upon returning from Djibouti in 2014.  ECF No. 66-3 at ARI 1957.  As noted in a March 2014 medical report by a Navy doctor, Ford ruptured a disk while participating in unit physical training in 2008.  ECF No. 82-2 at ARII 0543.  Ford also had surgery for a right shoulder impingement in the fall of 2014.  *Id.* at ARII 0546–47, 0550.  Ford was "cleared for full duty and demobilization from [an] orthopedics standpoint" on November 13, 2014.  ECF No. 66-3 at ARI 1957.  While a November 19, 2014, medical record states he was in MED HOLD for post-operative right shoulder pain, he was found fit for duty by his surgeon.  ECF No. 82-2 at ARII 0550.  Ford was considered Physical Risk Classification ("PRC") B as a result of the chronic back pain and the recovering shoulder pain.  ECF No. 135 at ARIII 0013 (citing MILPERSMAN 61120-020).  PRC B means that Ford was a member "generally considered physically qualified for assignment to all duties . . . and is recommended for retention in the Navy Reserve.  However, the member has a physical defect or condition that could restrict the member's active duty assignment."  *Id.*  Another November 2014 doctor's note

---

[2] The BCNR eventually shifted his official retirement date from March 1, 2016, to April 1, 2016.  ECF No. 23 at 6.

finds Ford had an LOD for his right shoulder and that he was sent home for an LOD for his back. ECF No. 82-2 at ARII 0561–62.

Ford first raised mental health concerns in a June 2014 post-deployment health assessment, noting an interest in speaking with someone about his mental health. *Id.* at ARII 0550. A doctor's note from November 2014 also mentions Ford's mental health, providing that Ford was not evaluated for a claim of nightmares he attributes to his stint as a law enforcement officer. *Id.* at ARII 0561–62. The November 2014 doctor's note recommended a PTSD evaluation. *Id.* A record of medical care dated a month later reveals that Ford was subsequently diagnosed with an adjustment disorder by the Navy, in addition to being diagnosed with PTSD by the Department of Veteran Affairs ("VA"). *Id.* at ARII 0565, 0583.

### C.    The BCNR's remand decision

On January 27, 2025, the BCNR provided Ford with a new, twenty-nine-page decision— supported by thousands of pages of exhibits—denying Ford's appeal to reconsider, finding "insufficient evidence of any material error or injustice in [Ford's] naval record beyond that already addressed . . . ." ECF No. 135 at ARIII 0001. The BCNR explains how a three-member panel, reconsidering Ford's application de novo, came to this conclusion:

> Upon careful review and consideration of all the evidence of record, the Board continued to find insufficient evidence of any material error or injustice warranting relief beyond that which had already been granted . . . . Specifically, the Board found insufficient evidence to conclude that [Ford] incurred or aggravated any PTSD condition during [his] naval service. The Board also found insufficient evidence of any error or injustice in the Benefit Issuance Authority's (BIA) denial of line of duty (LOD) benefits for [Ford's] back pain and claimed PTSD condition apart from the timeliness of its decision.[] Finally, the Board found insufficient evidence to conclude that [Ford was] at any time unfit to perform the duties of [his] office, grade, rank, or rating for any one or combination of [his] physical ailments.

*Id.* at ARIII 0005. The BCNR detailed the documentation used for this decision, such as this court's *Ford II* decision, a legal brief provided by Ford's counsel, an advisory opinion ("AO") from the Secretary of the Navy ("SECNAV") Council of Review Boards Psychiatric Medical Advisor ("CORB PMA"), "relevant portions of [Ford's] naval and in-service medical records," and applicable policies, regulations, and statutes. *Id.* at ARIII 0001–02.

The BCNR also denied Ford's request for an in-person hearing as his "personal appearance, with or without counsel, would not materially add to its understanding of the issues involved in [this] case." *Id.* at ARIII 0002.

## II.    Standard of review

The court may grant a judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). The court applies the deferential

standard of the Administrative Procedure Act's standard of review and "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Chambers v. United States,* 417 F.3d 1218, 1227 (Fed. Cir. 2005); *see also Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006). Thus, a decision will not be vacated unless the movant satisfies its burden of proof by demonstrating the administrative decision was not in accordance with the law.[3] A decision is contrary to the law if

> [the decision-making body] relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [BCNR], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Anderson v. United States*, 111 Fed. Cl. 572, 578 (2013); *but see Peoples v. United States*, 87 Fed. Cl. 553, 576 (2009) (cleaned up) (holding that the Board need not explain the reasons underpinning its decision "in great detail"). The movant must also prove that such erroneous decision-making was prejudicial in nature, thereby materially affecting conclusions made based on the record. *Fisher v. United States*, 81 Fed. Cl. 155, 158–59 (2008) (citations omitted).

When reviewing a BCNR decision, the court also factors in the "presumption of regularity." Military regulations require official actions of public officials to be awarded a "presumption of regularity"; therefore, "[i]n the absence of clear evidence to the contrary, [it is] presume[d] that public officers have properly discharged their official duties." *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001); 32 C.F.R. § 723.3(e); SECNAV Instruction ("SECNAVINST") 5420.193, Encl. (1), ¶ 3(e)(2). "Generally, 'military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs.'" *Glomski v. United States*, 174 Fed. Cl. 579, 584 (2025) (quoting *Williams v. United States*, 116 Fed. Cl. 149, 158 (2014) (cleaned up).[4]

---

[3] Plaintiffs also carry the burden of proof in BCNR adjudications reconsidering LOD and disability determinations. ECF No. 135 at ARIII 0003 ("It is always [the applicant's] burden, as the applicant seeking to change an official naval record which is presumed to be correct, to prove the existence of an error or injustice in that record warranting relief.").

[4] Ford contends the presumption of regularity does not apply "[i]f the challenger meets the low bar of coming forth with substantial evidence in support of his or her assertions" against the military. ECF No. 138-1 at 11–12. Not so. Providing substantial evidence to override the "presumption of regularity" is not a low bar. Rather, it indicates the BCNR is expected to award the benefit of the doubt to official actions of public officials. *See Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993); *see also* ECF No. 135 at ARIII 0003 (holding that "the Board is obligated to start with the premise that the naval record in question is correct."). This court will not relieve Ford of the burden of providing substantial, clear evidence demonstrating an error or injustice exists.

Unlike summary judgment, the court does not require a movant to prove that there is "no genuine dispute as to any material fact." RCFC 56. Rather, for MJARs, the court holds "an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–56 (Fed. Cir. 2005). The court is not tasked with reweighing the evidence; the court is tasked with determining "whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983); *see also Melville v. United States*, 231 Ct. Cl. 776, 779 (1982) (clarifying that a movant is not tasked with proving "that there is ample evidence to show that the [board's decision] was wrong," but proving there is not "substantial evidence to show that [the board's decision] was right"). To avoid the court improperly reviewing a BCNR decision de novo, it is "normally limited to the administrative record developed before the military board" when deciding whether to grant judgment. *Bateson v. United States*, 48 Fed. Cl. 162, 164 (2000); *see also Kelly v. United States (Kelly III)*, 179 Fed. Cl. 313, 322 (2026) (citing *Sharpe v. United States*, 935 F.3d 1352, 1358 (Fed. Cir. 2019) (citation omitted)) ("As such, the Court may not "substitute [its] judgment for that of [the agency], but instead must confine [itself] to ensuring that [the agency] remained within the bounds of reasoned decisionmaking.").[5]

### III. Ford has failed to establish an entitlement to active duty backpay.

First, Ford contends that he is entitled to back pay because he was improperly separated from active duty when returned to reserve status on January 29, 2015. ECF No. 89 at 31–32.[6] As a result, he claims to be entitled to active duty back pay from then until the date of his retirement. According to Ford, his removal from active duty was improper because he was not fit for duty at the time of release.

If a reserve member "incurs or aggravates an injury" while on active duty for more than thirty-one days, the member remains on active duty until found "fit for duty." DoD Instruction ("DODI") 1241.2 ¶ 6.6.3.2. Ford contends that the lack of an LOD for his back and PTSD— coupled with the restricted duty status for his post-operative shoulder—means that he was not "fit for duty" when he was released from active duty. *See* SECNAVINST 1770.3D ¶ 6(e) (defining "fit for duty" to mean "[a] pronouncement by a Military physician or by a Medical Evaluation Board that a service member previously on light or limited duty has healed from the injury, illness, or disease that necessitated the member's serving in a medically restricted duty

---

[5] Ford's counsel suggests the court "ought to adopt a 'three strikes' rule in disability benefits cases and put an end to the endless 'ping-pong' between the Court and the correction boards that occurs in these cases." ECF No. 138-1 at 34. No statute or regulation is provided to support this. Rather, counsel seeks for the court to supersede the BCNR's judgment as "[i]t should be apparent to the Court that both the Board and the PEB will not change their positions that LCDR Ford is not unfit." *Id*. But it is not the court's role to supplant the BCNR; it is Plaintiff's burden to show the BCNR's decision is arbitrary or capricious. Put another way, the fact that the BCNR does not change its view of Ford's case does nothing to support that the BCNR is wrong.

[6] The Government contends that Ford waived this claim because he does not raise it in is current MJAR. ECF No. 141 at 2 n. 2. The court declines to find waiver because it deferred resolution of this issue in *Ford II* and Ford explicitly incorporates his briefing from *Ford II*. ECF No. 138-1 at 10. Thus, the court refers to that briefing on this issue.

status."). Because Ford argues that he was not fit for duty when transferred to the reserve component, he asserts entitlement to active duty pay under the constructive service doctrine.

"Under the constructive service doctrine, 'military personnel who have been illegally or improperly separated from service are deemed to have continued in active service until their legal separation.'" *Barnick v. United States*, 591 F.3d 1372, 1379 (Fed. Cir. 2010) (quoting *Christian v. United States*, 337 F.3d 1338, 1347 (Fed. Cir. 2003)). The theory behind the doctrine is that when service members are unlawfully removed from active duty, they are deemed to have served through the period of their unlawful removal. *Id.* (citing *Dilley v. Alexander*, 627 F.2d 407, 413 (D.C. Cir. 1980)).

The BCNR found there was no error relating to Ford's release from active duty because a Navy doctor had found him fit for duty and demobilization in a November 13, 2014, report—only two months prior to his release. ECF No. 86 at ARII 0002. This fit for duty determination satisfies DODI 1241.2's provision that Ford be held on active duty until he is fit for duty. Given the proximity in time of this medical evaluation to Ford's release from active duty, the BCNR reasonably concluded the evaluation was the best evidence of Ford's fitness at the time of his release.[7]

None of Ford's arguments challenging the fit for duty determination suffice to render the BCNR's conclusion arbitrary or capricious. First, Ford argues that the November fit for duty determination was arbitrary and capricious because it was made before he fully healed. ECF No. 138-1 at 37. Indeed, the orthopedic surgeon placed Ford on a restricted duty status to allow for further healing. ECF No. 135 at ARIII 0013. The BCNR addressed this point:

> In other words, as of 21 November 2014, the Orthopedic Surgeon who conducted [Ford's] surgery and who was professionally responsible for [Ford's] care and well-being considered [his] shoulder injury to be healed, and PERS-95 assessed that [his] shoulder injury did not warrant any duty limitations and that [Ford was] able to perform the duties of [his] grade, designator, and rating.

*Id.* On top of this, Ford did not present medical evidence to contradict the surgeon's findings.

Much of Ford's back injury and PTSD arguments are overridden by the BCNR's most recent decision, *id.* at ARIII 0001–27. There, the BCNR explains at length why neither the back injury nor PTSD diagnosis were incurred or aggravated in the LOD, *see* ECF No. 86 at ARII 0002, which the court discusses below in Section IV. Specifically, as to the back injury, no medical professional contemporaneously considered the Department of the Navy Physical Evaluation Board ("PEB") referral necessary. ECF No. 135 at ARIII 0012. Ford even reported to a case manager that his medical issues were "currently under control." *Id.* at ARIII 0013–14.

---

[7] To be clear, the discussion in this section is about Ford's fitness for duty upon release from active duty, which relates only to his claim for back pay. The question of Ford's fitness for duty at the time of his retirement is addressed in the court's consideration of Ford's disability claim in Section V.

7

Additionally, as discussed below in Section V.B, a CORB PMA—who was also a voting member of the PEB—found Ford to be fit for duty. *Id.* at ARIII 0043. While Ford may disagree with this determination, he fails to present competing medical evidence. *Id.* at ARIII 0002, 0004. As to the PTSD diagnosis, the BCNR found Ford's argument to be insufficient as Ford underwent mental health evaluations with PTSD in mind, as discussed below in Section IV.C. *Id.* at ARIII 0006, 0007. Again, Ford presents no evidence to contradict the BCNR's finding that he was fit to separate. Altogether, Ford did not sufficiently counter the finding that he was "fit for duty" at the time of release from active duty; thus, he is not entitled to back pay.

Ford fails to provide sufficient evidence to demonstrate the BCNR's decision denying his active duty backpay and LOD is arbitrary and capricious.

## IV. The BCNR's denial of incapacitation pay is rational and supported by evidence in the record.

Second, Ford argues that, if found to be ineligible for active duty back pay, he is still entitled to incapacitation pay for being unable to perform military duties. ECF No. 89 at 34–36. Ford seeks incapacitation benefits spanning from January 29, 2015, through April 1, 2016. ECF No. 86 at ARII 0003. Specifically, he contends that his back injury, shoulder injury, and PTSD would disqualify him from entering the service under DODI 6130.03 and DODI 6490.07. ECF No. 89 at 35. But this argument is quickly dismantled given that the BCNR and medical professionals found Ford to be fit for duty upon release from active duty. ECF No. 135 at ARIII 00043; ECF No. 86 at ARII 0004 ("As explained previously, the Board concluded [Ford was] fit for active duty when released on 29 January 2015, and therefore determined [Ford] did not qualify for incapacitation pay based on [his] inability to perform military duties.").

### A. Ford failed to provide sufficient documentation of lost civilian pay due to his shoulder injury.

A line of duty determination is needed when it is questionable "whether the injury, illness or disease was incurred or aggravated in the LOD." SECNAVINST 1770.3D ¶ 6(l).[8] If discovered that the injury, illness, or disease was not incurred or aggravated in the LOD, then the service member is not eligible for incapacitation pay.[9] *Id.* ¶ 9(b). 37 U.S.C. § 204(h)(1) provides that incapacitation pay can be provided for a "member of a reserve component . . . [if] the member demonstrates a loss of earned income from nonmilitary employment or self-employment as a result of an injury, illness, or disease incurred or aggravated" in the LOD. *See also* SECNAVINST 1770.3D ¶ 3. A member must demonstrate an inability to perform military duties or "a loss of earned income from nonmilitary employment or self-employment as a result

---

[8] The Navy replaced SECNAVINST 1770.3D in 2018 with SECNAVINST 1770.5. Because Ford seeks LOD benefits for periods prior to 2018, the court applies SECNAVINST 1770.3D because it was in effect at the time Ford claims entitlement.

[9] If a service member's fitness for continued naval service is questionable due to a possibility of an injury, illness, or disease being incurred or aggravated in the LOD, the BIA shall also direct the case to the PEB for a disability evaluation. SECNAVINST 1770.3D ¶ 9(a)(3). Military disability determinations are discussed below in Section V.

of an in-LOD condition." DODI 1241.01, Encl. (4), ¶ 2(c). In making LOD determinations, the BIA "presume[s] that an injury, illness or disease was incurred in the Line of Duty and not due to gross negligence, intentional misconduct, or willful neglect." SECNAVINST 1770.3D ¶ 6(l).

Ford argues that, if found to be ineligible for active duty back pay as discussed in Section III, he is still entitled to incapacitation pay based on a loss of civilian income. ECF No. 89 at 36–38. While Ford has attempted to provide documentation to show his claimed loss of earned income, his documentation was insufficiently filled out, had incomplete sections, and was missing medical certification. ECF No. 86 at ARII 0004. Consequently, the BCNR found these gaps rendered the loss-of-civilian-income pay determination "impossible to make." *Id.* Although Ford claims the BCNR contradicted the record by finding the documentation insufficient, partially completed forms are not enough to satisfy Ford's burden of proof. In fact, Ford left the section titled "Medical Provider Work Certification" blank on thirteen separate forms, in addition to other deficiencies. ECF No. 90 at 19 (citing ECF No. 81-4 at 0682–94). Another error noted by the Government is that Ford's medical provider was confused about whether Ford's left or right shoulder was the source of the LOD injury. ECF No. 90 at 19. Given these errors and omissions, the BCNR did not act in an arbitrary or capricious manner in denying incapacitation pay for loss of civilian income.

Ford claims that the BCNR finding insufficient evidence of error or injustice in the denial of LOD eligibility was arbitrary, capricious, contrary to law, or unsupported by substantial evidence. He finds fault in the BCNR's initial denial of LOD eligibility for the alleged back injury and PTSD. Previously, the court found the BCNR's decision to be arbitrary and capricious as it had not overcome the presumption that Ford's injuries were incurred or aggravated in the LOD. *Ford II*, 172 Fed. Cl. at 308–10. But Ford's LOD arguments no longer hold water.

Ford was released from active duty after his unauthorized absence in Djibouti. ECF No. 82-2 at ARII 0500. While in reserve status, Ford requested an LOD assessment for January 30, 2015, through September 14, 2016—the period between his release from active duty to his placement in the reserve component. *Id.* at ARII 0500. Ford underwent an LOD evaluation for his back injury, shoulder injury, and claimed PTSD. *Id.* at ARII 0675. The Navy, however, did not determine eligibility until after Ford was initially retired on March 15, 2016, months after the initial LOD assessment. *Id.* at ARII 0677. The Navy determined there was no LOD finding for the back and PTSD claims; the only LOD finding was for the right shoulder impingement. *Id.* at ARII 0677. This created complications as regulations require an interim LOD determination within thirty days of the injury being reported. *See* DODI 1241.2 ¶ 6.4.2. The BCNR has acknowledged that, although the Navy neglected to make timely LOD determinations, Ford cannot rescind his retirement to receive LOD benefits since his retirement was proper. ECF No. 82-2 at ARII 0491 (citing ECF No. 66-1 at ARI 1128–29).

That said, the BCNR did take "partial corrective action" and permitted Ford to submit documentation to establish retroactive LOD benefits for his shoulder. ECF No. 23 at 5. But Ford never submitted all the necessary documentation. Despite being assigned a representative to assist with documentation, and despite agreement that legal counsel would assist with documentation, the evidence was never produced. ECF Nos. 30, 57; *see also* ECF No. 82-2 at ARII 0492. The BCNR thus has consistently denied LOD benefits, finding that Ford "failed to

substantiate [his] inability to perform [his] civilian duties due to [his] right shoulder or any of the claimed conditions." ECF No. 23 at 4; ECF No. 82-2 at ARII 0492 (denying benefits due to missing civilian earning statements and "inconsistencies regarding the requested pay and the approved injury").

In the end, the BCNR had been willing to consider Ford's claim for incapacitation pay for lost civilian income, so long as Ford could substantiate the claim. The BCNR was not acting in an arbitrary or capricious manner when it denied Ford's claim because he could not document his lost civilian income.

**B.      LCDR Ford's back injury was not incurred or aggravated in the LOD.**

Ford contends his back injury is an LOD injury because he (1) incurred the injury on active duty "while playing basketball in 2008" and (2) aggravated the injury "while deployed to Djibouti when he turned his back in the wrong direction." ECF No. 138-1 at 6 (citing *Ford II*, 172 Fed. Cl. at 308). In *Ford II,* this court agreed with Ford that the BCNR's decision was arbitrary and capricious. There, the BCNR did not provide "clear and convincing evidence" to override the presumption his back injury was incurred and aggravated in the LOD. *Ford II*, 172 Fed. Cl. at 308. The BCNR also did not properly consider Ford's time in active duty, in addition to the "competing narratives from medical advisors" regarding his back injury. *Id.*

On remand, the BCNR again found no error or injustice in the BIA's denial of LOD for Ford's back pain. The BCNR concluded "[t]here is no evidence in the record to suggest that the lower back pain that [Ford was] experiencing at the time of [his] release from active duty was any worse than that which [he] had experience[d] over the course of [his] career." ECF No. 135 at ARIII 0011. Here, the BCNR relied on the determination of a Senior Medical Officer who provided an advisory opinion about Ford's back pain in a different docket. *Id*. This opinion concluded that Ford's back injury preexisted his most recent period of active duty and found that there was a lack of supporting documentation showing aggravation beyond natural progression. *Id.* at ARIII 0441, 0598–600. Medical records similarly demonstrate that, at the time Ford sought back treatment in Camp Lemonnier in March 2014, he articulated that this was his "usual [back] pain." ECF No. 136 at ARIII 1177. The BCNR also looked to the VA's finding that his disability rating having increased by 10% constitutes merely natural progression. ECF No. 135 at ARIII 0011.

In its most recent decision, the BCNR found that Ford "provided . . . no medical evidence to overcome these opinions rendered by qualified medical officers who are responsible for advising the DON entity responsible for making LOD determinations." *Id*. Ford pushes back on this notion, reiterating the presumption that a condition discovered during earlier active service which recurs in subsequent active service is an LOD injury. ECF No. 138-1 at 28 (citing SECNAVINST 1850.4E, Encl. (3), ¶ 3804(n)). This misapplies the SECNAV Instructions. SECNAVINST 1850.4E applies to disability evaluations, discussed below in Section V, whereas SECNAVINST 1770.3D applies to LOD evaluations. ECF No. 135 at ARIII 0011. As medical professionals are better suited to determine whether a condition worsened beyond its normal progression, there was nothing arbitrary or capricious about the BCNR's consideration of the record, including the medical advisory opinions on that issue. Altogether, the BCNR provided

sufficient explanation as to why no error or injustice exists in not finding for Ford's back injury having been incurred or aggravated in the LOD.

### C.       LCDR Ford's PTSD was not incurred or aggravated in the LOD.

In *Ford II*, this court held the BCNR's denial of LOD benefits for the PTSD diagnosis was arbitrary and capricious. *Ford II*, 172 Fed. Cl. at 308–09. Specifically, the court held the BCNR improperly relied on the VA's conclusion that his PTSD was not service connected. *Id.* The BCNR cannot simply rely on VA findings given the VA regulations require an in-service stressor (that the VA could not identify here) while the DOD regulations do not. The court also noted the importance of the BCNR's medical professionals not disputing the PTSD diagnosis, and the fact that Ford had been diagnosed with PTSD by the VA and external medical providers. *Id.* at 310. As the court concluded, the Navy should be able to identify whether Ford's service caused PTSD. For these reasons, the court remanded this LOD consideration to the BCNR. *Id.* at 314.

The BCNR's thorough review of the record on remand supports its conclusion that Ford's PTSD was not incurred or aggravated on active duty. At the outset, the court acknowledges that the BCNR's conclusions about Ford's PTSD diagnosis are pointed. But that does not mean these conclusions are wrong.

First, the BCNR found the VA's PTSD diagnosis somewhat unreliable because it was "premised upon [Ford's] blatantly dishonest claim regarding exposure to combat-rated trauma while deployed in Djibouti." ECF No. 135 at ARIII 0005. The BCNR found that Ford "falsely reported" witnessing the terrorist attack in Djibouti to the VA clinical psychologist who originally diagnosed him with PTSD. *Id.* Specifically, the VA psychologist that diagnosed Ford with PTSD noted that Ford "witnessed an IED explosion in May 2014, which killed 3 and wounded 13. Veteran was not injured in the explosion but he witnessed people that were." *Id.* at ARIII 0284. The BCNR concluded that Ford could not have witnessed the explosion or its aftermath. *Id.* at ARIII 0005. The record supports this conclusion. In fact, Ford could not have witnessed this IED explosion because the attack occurred while he was absent without leave in Addis Ababa, Ethiopia. *Id.* at ARIII 0005. And Ford does not dispute that he did not see the attack. ECF No. 138-1 at 24 ("It is of course true that LCDR Ford could not have witnessed the actual explosion caused by two terrorists . . . because he was in Ethiopia at the time."). As Ford did not witness the terrorist attack, it is not arbitrary and capricious for the BCNR to conclude that the attack did not cause Ford to develop PTSD.

Ford challenges the BCNR's conclusion because it "is based upon one single sentence in LCDR Ford's extensive medical record." *Id.* at 23. Ford contends that, although he did not witness the terrorist attack or the direct aftermath, he finds it "probable" he witnessed the "'residuals' of the blast." *Id.* at 23–26. But Ford provided no evidence of this to the BCNR. Instead, he relies on guesswork and mere probability of an occurrence to argue he is eligible for an LOD finding. The court cannot say guesswork is enough to show an administrative decision is not in accordance with the law. There is nothing arbitrary about the BCNR concluding that

11

Ford's undeniable absence during the terrorist attack makes it factually impossible he "witnessed" the bombing.[10]  ECF No. 135 at ARIII 0005–10.

Ford similarly tries to attribute mental health issues to a "tank" rollover incident which occurred three weeks after the terrorist attack.  ECF No. 138-1 at 26 (citing ECF No. 82-2 at ARII 0577); *see also* ECF No. 135 at ARIII 0284.  Although there was no indication of a tank rollover in Djibouti during his deployment, there was an incident involving a Humvee rollover that injured a soldier.  ECF No. 138-1 at 26.  Ford's counsel writes this "likely caused some commotion among personnel" and that "it is plausible that is could have been traumatic for the LCDR."  *Id.* at 26–27.  But Ford did not witness the rollover accident either.  ECF No. 135 at ARIII 0284.  Rather, Ford "gave blood for an accident [he] did not actually witness."  *Id.* at ARIII 0005 n. 15.  Given his lack of connection to the Humvee rollover and his lack of contradicting evidence, the BCNR did not act in an arbitrary and capricious manner in dismissing this claim.

Second, the BCNR found it highly probative that Ford was not diagnosed with PTSD while on active duty (or at any other time by a Navy doctor).  And the BCNR found that liberal consideration would not change its determination because a Navy medical professional assessed Ford for PTSD concerns and diagnosed him with an adjustment disorder—not PTSD.  *Id.* at ARIII 0006, 0254–57.  This assessment took place in December 2014, only six weeks prior to his release from active duty.  *Id.*  As the BCNR put it, "[l]iberal consideration does not require the Board to suspend its common sense or to ignore the clear and unmistakable evidence that the diagnoses upon which [Ford] base[d his] claim of PTSD were premised upon a lie."[11]  *Id.* at ARIII 0007.  The BCNR relied on the PERS-95's denial of LOD benefits to further evidence this point.  *Id.* at ARIII 0006–7.  In the end, the BCNR's reliance on the contemporaneous medical examination that specifically considered whether Ford had PTSD was reasonable, and the court finds no basis to second-guess that determination.

Third, the BCNR considered Ford's past civilian law enforcement experiences as a potential trigger of Ford's supposed PTSD.  *Id.* at ARIII 0009.  When Ford originally sought mental health treatment during active service, he attributed nightmares to prior law enforcement work.  *Id.* at ARIII 0009; ECF No. 136 at ARIII 1230.  The BCNR found this experience, which occurred before his most recent deployment, provided further support for the proposition that Ford's PTSD was neither incurred nor aggravated during his military service.  ECF No. 135 at ARIII 0009.  Ford finds this to be in error since "PTSD can be delayed following trauma."  ECF No. 138-1 at 28.  If PTSD symptoms emerged during active duty, Ford argues they are presumed to be incurred in the LOD under SECNAVINST 1850.4E, Encl. (3), ¶ 3804(n).  As discussed

---

[10] Thus, the court does not give weight to Ford's argument that, even if the BCNR disagreed with the PTSD diagnosis, it could not dispute that Ford presented PTSD-like symptoms.  ECF No. 138-1 at 22.  Ford bases this argument on his VA assessment and his claims of difficulty interacting with others while serving.  ECF No. 135 at ARIII 0019.  But the BCNR relied upon various medical evaluations from his time in the Navy, the lack of candor with the VA psychologist, and the record showing that Ford had no documented difficulty interacting with others in Djibouti.  *Id.*

[11] For more on requiring liberal consideration, *see* Section V.A.

above in Section IV.C, however, the presumption found in SECNAVINST 1850.4E, Encl. (3), ¶ 3804(n) is inapplicable to LOD determinations.  On top of this, the BCNR reasonably explained its lingering doubts of Ford's PTSD diagnosis due to the "false report of trauma exposure" and Ford "omit[ing] this experience during [his] initial intake with the VA psychologist who originally diagnosed [him] with PTSD."  ECF No. 135 at ARIII 0009.

Altogether, Ford failed to put forth sufficient evidence to override the detailed decision of the BCNR denying his back injury and PTSD LOD eligibility.

## V.      Disability eligibility and benefits

Third, Ford argues he is entitled to disability benefits due to his shoulder injury, back injury, and supposed PTSD.

When it comes to disability evaluations, "[a] case *usually* enters the Department of the Navy DES when a Medical Evaluation Board (MEB) is dictated for the purpose of evaluating the diagnosis and treatment of a member who is unable to return to military duty because the member's condition most likely is permanent."  SECNAVINST 1850.4E, Encl. (3), ¶ 3102(a) (emphasis added).  Under DODI 1332.18, the criteria for referral to the Disability Evaluation System ("DES") is that the service member has one or more medical conditions—individually or in the aggregate—preventing that member from reasonably performing his or her duties. "[R]eferrals occur when the course of further recovery for the relevant medical conditions is relatively predictable or within one year of diagnosis."  DODI 1332.18.  The "final stage of the DES" is receiving an evaluation from the Physical Evaluation Board regarding a member's fitness and eligibility for benefits.  ECF No. 135 at ARIII 0011.

Ford was not referred to the PEB for a disability determination at any point.  And the BCNR asserts that it is not qualified to make a disability determination because various regulations or instructions state that only the PEB can make that determination.  *E.g.*, SECNAVINST 1850.4E, Encl. (3), ¶ 3303.  The Federal Circuit, however, has concluded that the BCNR "is competent to make a disability determination in the first instance."  *Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991).  In other words, the BCNR is not required to send a case to the PEB for a fitness determination.  The BCNR can conclude that there is no error or injustice resulting from the Navy not sending Ford to the PEB for a disability evaluation if the record does not support that he was disabled during his active or reserve duty.  That is what the BCNR did here.

Disability benefits, like separation benefits, depend on a service member's fitness for continued naval service.  *See* 10 U.S.C. §§ 1201, 1204.  To qualify for disability benefits, service members must have at least twenty years of service or a physical disability rating of 30% or greater.  *Id.* § 1201(a).  SECNAVINST 1850.4E sets out the standards and procedures for adjudicating disability claims: "The sole standard to be used in making determinations of physical disability as a basis for retirement or separation is *unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay*."  SECNAVINST 1850.4E, Encl. (3), ¶ 3301 (emphasis added).  A diagnosis alone is not sufficient for a finding of unfitness.  *Id.*; *see* ECF No. 135 at ARIII 0004.  Findings of unfitness are based on the preponderance of the evidence.  SECNAVINST 1850.4E, Encl. (3), ¶

3306(b).  There is also a presumption that service members are fit.  *Id.* ¶ 3306(a) ("Benefit of unresolved doubt shall be resolved in favor of the fitness of the service member under the rebuttable presumption that the member desires to be found Fit.").

Ford incorrectly asserts the BCNR cannot deny him a finding of unfitness without rejecting his physician's and the VA doctors' medical opinions.  ECF No. 135 at ARIII 0004.  Because these medical professionals do not make fitness determinations, the BCNR is not required to follow their opinions (although the BCNR may afford them weight if it so chooses).  *Kelly v. United States (Kelly II)*, 69 F.4th 887, 899 (Fed. Cir. 2023) ("VA regulations and VA decisions concerning disability are not binding on matters involving military disability retirement pay.").

When determining whether there is an error or injustice regarding a service member's fitness determination, the BCNR considers the service member's: (1) ability to complete common military tasks, (2) physical readiness/fitness tests ("PRT/PFT"), (3) deployability, and (4) special qualifications.  SECNAVINST 1850.4E, Encl. (3), ¶ 3304(a).  The BCNR typically considers these factors based on what a service member's capabilities were "immediately before separation."  *Kelly v. United States (Kelly I)*, 157 Fed. Cl. 114, 125 (2021).  But the BCNR also considers any "remaining period of Reserve obligation" as well.  SECNAVINST 1850.4E, Encl. (3), ¶ 3302(a).

Previously, the court held "[t]he record is devoid of any attempt by the BCNR to apply the criteria set forth in SECNAVINST 1850.4E, Encl. (3), ¶ 3304" and the BCNR did not necessarily fulfill "its duty to apply the relevant regulations to the evidence."  *Ford II*, 172 Fed. Cl. at 312.  Thus, the court remanded to the BCNR for it to consider SECNAVINST 1850.4E's criteria.  *Id.* at 313–14.  The court also instructed the BCNR "to consider what, if any, effect Ford's PTSD and back injury had on his ability to perform his normal duties."  *Id.*

Ford again argued to the BCNR that his record required correction because he should have been found unfit due to his shoulder injury, back injury, and PTSD diagnosis.  ECF No. 135 at ARIII 0003.  Once again, the BCNR declined to reconsider.  *Id.*  Ford contends this denial was arbitrary and capricious, believing the BCNR did not give liberal consideration to his mental health issues, properly refer him to a PEB for a disability determination, nor consider his whole record in making a decision.

As Ford did not provide sufficient evidence to contradict the BCNR's finding of fitness on any of these issues, Ford falls short of demonstrating that the BCNR's decision to not reconsider his disability retirement and benefits eligibility was arbitrary and capricious, contrary to law, or unsupported by substantial evidence.

### A.    Ford's reliance on Kurta and Vazirani memoranda

Before delving into the fitness determination factors, the court looks to Ford's argument that liberal consideration should be given to some of his disability-related claims.

Ford argues he was owed liberal consideration on whether mental health issues contributed to his unauthorized absence, citing the Kurta and Vazirani memoranda.  ECF No. 138-1 at 33.  The Kurta memorandum provides "[l]iberal consideration will be given to veterans

petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions, including PTSD." ECF No. 141-4 at 2; *see Doyon v. United States*, 58 F.4th 1235 (Fed. Cir. 2023). The Vazirani memorandum clarifies liberal consideration only applies to changes in characterizations of service—not fitness determinations themselves. ECF No. 141-10.

Regardless of whether the court awarded liberal consideration to Ford or not, his claim would be found lacking. No level of liberal consideration pursuant to the Kurta and Vazirani memoranda would mandate the BCNR to find that the terrorist attack or "tank" rollover contributed to his misconduct. Both events that Ford claims contributed to his misconduct—the bombing and "tank" rollover—occurred *during* and *after* his unauthorized absence. Ford's sole claim of trauma from *before* was his decades-earlier law enforcement career, ECF No. 136 at ARIII 1230, and he did not provide evidence of any alleged trauma being aggravated during his time of service. ECF No. 141-4 at 2. Liberal consideration cannot excuse absence without leave in this context. Therefore, even if the court were to provide such consideration in Ford's favor, it would be insufficient.

### B.      The DES, the PEB, and the BCNR

Ford brings up several issues involving how the DES, the PEB, and the BCNR are to be involved in disability determinations and findings of fitness. The court also addresses this before turning to the fitness determination factors.

First, Ford argues that his case should have been referred to the DES. ECF No. 138-1 at 20; ECF No. 135 at ARIII 0011–15. When a Navy doctor believes a service member may be unfit for continued naval service, that doctor typically refers the case to the DES to conduct a disability evaluation. ECF No. 135 at ARIII 0014 (citing SECNAVINST 1850.4E, Encl. (3), ¶ 3201(b)). Then, the MEB evaluates whether the service member's conditions might interfere with his or her ability to reasonably conduct his or her duties. The PEB then assesses fitness and benefits eligibility. Here, the surgeon that operated on Ford's shoulder found him fit for duty following his recovery from surgery (albeit with a restricted status during recouperation). There is nothing to indicate that this determination was arbitrary or capricious.

Once he returned to the reserve after his surgery, Ford needed a notice of eligibility ("NOE") for referral to the DES due to any injury, or aggravation of an injury, *during reserve service*. *Id*. Given Ford did not provide medical evidence that reserve service aggravated his back, shoulder, or PTSD, the BCNR found Ford was "extremely unlikely to obtain the NOE required." ECF No. 135 at ARIII 0014–15. The BCNR reasonably found that a referral to an MEB was unlikely as no medical evidence provided showed such referral was needed. *Id.* at ARIII 0015. And the BCNR cannot "substitute its medical judgments for that of multiple medical professionals who were duty bound to refer [Ford] to the DES if the circumstances warranted it." *Id.* Given that Ford did not provide evidence of medical judgments finding his injuries warranted referral, the BCNR was not arbitrary or capricious in finding that referral to DES is unsupported by the record.

Second, Ford argued the matter of his fitness must be remanded to the PEB "since the Board asked for an AO [advisory opinion] from the PEB and the CORB PMA does not represent

the PEB." *Id.* at ARIII 0003.  This incorrectly characterizes the BCNR's request.  The BCNR sought an advisory opinion from the PEB on Ford's disability eligibility for his back pain, shoulder pain, and PTSD diagnosis due the BCNR's lack of medical expertise.  *Id.* at ARIII 0003.  The PEB assigned this request to a medical advisor (the CORB PMA), which satisfied the BCNR's request for an advisory opinion.  *Id.* at ARIII 0004.  The CORB Director that "oversees the PEB" and its appeals regarding fitness determinations also endorsed the advisory opinion.  *Id.* at ARIII 0004.  Nowhere in military regulations does it require that only the PEB may provide an advisory opinion.  Again, regulations only specify that advisory opinions are completed by "other naval authorities."  SECNAVINST 5420.193, Encl. (3), ¶ 7.  In fact, the BCNR may stand in the place of the PEB and make fitness determinations in the first instance.  *See Chambers*, 417 F.3d at 1225; *see also Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991).  Therefore, the matter of his fitness does not need to be remanded to the PEB.

Finally, Ford argues the BCNR was "required" to use his date of retirement for fitness determinations.  ECF No. 138-1 at 19.  Ford provides that, "[n]ormally, unfitness is determined as of the time of release from active duty."  *Id.* at 12.  But SECNAVINST 1850.4E, Encl. (3), § 3302(a) calls for fitness considerations "to include duties during a remaining period of Reserve obligation" as well.  In its decision, the BCNR considered both (1) Ford's active-duty obligations in Djibouti at the time of separation and (2) Ford's remaining reserve obligations at the time of retirement in denying Ford a finding of unfitness.  Thus, regardless of the date used for the fitness determination, the outcome is the same.  The BCNR's conclusion cannot be said to be arbitrary or capricious.

As this court requested the BCNR to further consider the "fitness question with instructions to apply the mandatory fitness criteria," *Ford II*, 172 Fed. Cl. at 313, the court will now evaluate each fitness factor enumerated in SECNAVINST 1850.4E, Encl. (3), ¶ 3304(a).

### C.    Disability Factors

For fitness determinations, the BCNR must evaluate all relevant criteria under SECNAVINST 1850.4E, Encl. (3), ¶ 3304.  *Kelly II*, 69 F.4th at 895–96.  These are the (1) ability to complete common military tasks, (2) physical readiness/fitness tests ("PRT/PFT"), (3) deployability, and (4) special qualifications.  SECNAVINST 1850.4E, Encl. (3), ¶ 3304(a).

### 1.    Common Military Tasks.

The first factor to consider is common military tasks.  "SECNAVINST 1850.4E does not define the level of detail required by the common-military-task consideration."  *Kelly I*, 157 Fed. Cl. at 125.  That said, "[t]he standard requires 'relating the nature and degree of physical disability of the member to the requirements and duties that member *may reasonably be expected to perform in his or her office, grade, rank, or rating*.'"  *Id.*  Mere discomfort in doing a task is insufficient for a finding of unfitness since it is not necessarily an inability to perform.  The standard for evaluating common military tasks and disability determinations "are effectively interchangeable."  *Ford II*, 172 Fed. Cl. at 310.  Given this, unlike other fitness factors, "a finding that a service member cannot perform his or her common military tasks is dispositive to the ultimate question of the member's unfitness."  *Id.*

The court looks to *Kelly* because it has a similar fact pattern and procedural history to this case. In *Kelly*, this court remanded because the BCNR only considered "whether [Mr. Kelly] was adequately performing duties—regardless of what those were—immediately before separation." *Kelly I*, 157 Fed. Cl. at 125. The BCNR instead needed to consider whether Kelly was adequately performing duties in light of his role as a Second Class Navy Diver. *Kelly III*, 179 Fed. Cl. at 324. The concept of "common military tasks" is dependent on whatever duties are reasonably expected by a service member in his or her specific role or classification.

Unlike *Kelly*, here the BCNR considered all the relevant criteria and evidence relating to Ford's common tasks as a Human Resources Officer. The BCNR analyzed HRO duties from both an active duty and reserve perspective and concluded that Ford was fit to perform them. ECF No. 135 at ARIII 0018 ("[T]he duties of your office, grade, rank, or rating were primarily cerebral rather than physical in nature . . . . None of your conditions would logically impair your ability to perform these common military tasks."). In fact, its findings on Ford's ability to undertake common military tasks spans about five pages. *Id.* at ARIII 0016–21. The BCNR concluded Ford had no duty limitations for several reasons. Ford's fitness reports reflect a high level of performance until his unauthorized absence, and showed acceptable performance after his absence. *Id.* at ARIII 0017. Additionally, Ford's duties presumably would have been awarded more flexibility given his capacity as a "relatively senior officer." *Id.* at ARIII 0018. As for reserve obligations, the BCNR specifically found that Ford's duties would have consisted only of weekend drills and annual training periods "conducted within the office environment." *Id.* at ARIII 0019. While Ford's medical records after his retirement are inconclusive regarding his fitness, the BCNR was not arbitrary or capricious in concluding that Ford was not unfit to perform, especially given him working in an office environment at the Department of Labor similar to that expected of him after release from active duty at NOSC Memphis. *Id.* at ARIII 0021, 0351.

As for the shoulder injury, back injury, and PTSD diagnosis, the BCNR found that none prevented Ford from performing common tasks in an active or reserve capacity. First, the BCNR concluded that Ford's tasks were unaffected by shoulder pain as it "could imagine no situation in which [Ford], as a relatively senior officer, would be required to perform such menial tasks, especially if [his] shoulder injury actually impeded [him] from doing so." *Id.* at ARIII 0018. Thus, the BCNR found that tasks such as lifting boxes were not among Ford's common tasks. *Id.* The BCNR also concluded there is no evidence of Ford's shoulder condition worsening in the time between his return stateside and his separation. Rather, the BCNR found "the only condition [Ford] presented which warranted any type of duty limitation was surgically repaired" and Ford was found to be "fully fit by the surgeon who performed the [shoulder] procedure after a six-week period . . . ." *Id.* at ARIII 0017. Ford had been assigned a PRC B designation at this time, "which implied that [Ford was] generally considered physically qualified for assignment to all duties consistent with [his] grade, designator, and rating." *Id.* Any arguments regarding physical therapy and other alleged hindrances do not override this finding of fitness by the surgeon since Ford fails to put forth contradicting medical evidence.

Second, although his duty could require long periods of sitting, *id.* at ARIII 0063, Ford had reported "no incapacitating episodes during the past 12 months" regarding the back pain following release from active duty. *Id.* at ARIII 0018. The BCNR also found it implausible that, as a relatively senior officer, Ford would be forced to sit all day without flexibility to move

17

around or take walking breaks. *Id.* at ARIII 0018. Although his VA disability rating increased from 10% before deployment to 20% after release from active duty, this modest increase was found to be "not probative of an aggravation" by the BCNR, and Ford provided no medical evidence to show it was more than just natural progression. *Id.* at ARIII 0011.

Third, the BCNR held that Ford's mental condition did not impair his duties as Ford did not present medical evidence of his reported anxiety and insomnia affecting his ability to perform. *Id.* at ARIII 0018. Additionally, his reported difficulty interacting with others due to mental health issues was not an observed issue in Djibouti. *Id.* at ARIII 0019. The BCNR found that Ford had not presented medical evidence of these mental health symptoms manifesting after being released from active duty. *Id.* at ARIII 0018–19.

Ford's primary challenge here is "the Board [] not concur[ring] with the AO's description of the duties associated with his office, grade, rank or rating." ECF No. 135 at ARIII 0004. Ford argues the BCNR "offered no explanation for its rejection of the PEB's enumeration of the physical requirement and common military tasks of Navy HRO," rendering its decision arbitrary and capricious. ECF No. 138-1 at 15. But nowhere in military regulations does it require the BCNR to *accept* an advisory opinion's recommendations. The regulations merely require the BCNR to "analyze the contents of the advisory opinion as it would any other evidentiary item and then make an independent determination . . . based on the total evidence of record." SECNAVINST 5420.193, Encl. (3), ¶ 7. Thus, the BCNR could disagree with the advisory opinion's description of Ford's duties if that disagreement was properly explained and that disagreement was rational. It was. The BCNR spends five pages rationally explaining its disagreements with the advisory opinion, including that Ford's relatively senior rank made physical labor unlikely. *See* ECF No. 135 at ARIII 0016–21. In any event, the BCNR and the advisory opinion came to the same conclusion that Ford was fit for duty, despite the differing duty descriptions. *Id.* at ARIII 0043. Even if the BCNR agreed with the advisory opinion's statement of Ford's duties, the outcome would be the same.

The BCNR considered all relevant evidence through and gave a rational explanation for its conclusions. Therefore, the BCNR did not act in an arbitrary and capricious manner when finding that Ford could perform the tasks of his office, grade, rank, or rating.

2.     PRT/PFT

The next factor is whether a medical condition bars a service member from participating in all or part of a PRT/PFT, and whether "permanent increased bodily harm will result from taking all or a portion of the PRT/PFT." SECNAVINST 1850.4E, Encl. (3), ¶ 3304(a)(2). The BCNR found it "was presented with conflicting evidence in its consideration of this fitness criteria." ECF No. 135 at ARIII 0021. BCNR recognized that, if accepting as true that Ford's back pain was worse after separation, Ford may have been unable to perform a PRT at that time. *Id.* at ARIII 0022. Even so, Ford was released from active duty "with no medical limitations whatsoever" other than the PRC B designation, which does not limit one's ability to take a PRT/PFT. *Id.* at ARIII 0021. And none of Ford's medical providers determined that he was unable to participate in a PRT/PFT when released from active duty. *Id.* Although Ford's shoulder surgeon limited his ability to take a PRT for a six-week period post-surgery, the surgeon otherwise found him fit for duty. *Id.*

18

Even if Ford had been incapable of performing a PRT/PFT, the BCNR found this to be irrelevant. Because the Navy returned Ford to the continental United States for his misconduct and released from active duty, he would not need to take a PRT again and his "ability to perform it any time after 1 April 2026 was irrelevant to this assessment." *Id.* at ARIII 0022. Additionally, "[i]nability to take/pass the PRT/PFT [is] not [to] be the sole basis for a finding of Unfit to continue naval service." SECNAVINST 1850.4E, Encl. (3), ¶ 3307(b).

The BCNR properly considered all information regarding fitness tests, and Ford did not present any medical evidence demonstrating an inability to perform such tests before his release from active duty. Thus, it was not arbitrary and capricious for the BCNR to conclude that this factor has minimal relevance regarding Ford's fitness or lack thereof.

### 3. Deployability

The third factor considered is whether a service member is deployable. SECNAVINST 1850.4E, Encl. (3). ¶ 3304(a)(3). SECNAVINST 1850.4E, Encl. (2), ¶ 2019 defines "deployable" as a "determination that the member is free of a medical condition(s) that prevents positioning the member . . . to a location outside the Continental United States for an unspecified period of time." The BCNR found this factor weighs heaviest in Ford's favor due to his PRC B designation. ECF No. 135 at ARIII 0022. This designation would typically bar an assignment outside the continental United States. *Id.* That said, this factor is neither dispositive for, nor necessarily relevant to, Ford's fitness determination. SECNAVINST 1850.4E, Encl. (3), ¶ 3307(a) ("Inability to perform the duties of his or her office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of Unfitness."). Due to his misconduct while deployed overseas, the BCNR reasonably found that deployment outside of the United States could not have been realistically expected again for Ford. ECF No. 135 at ARIII 0023. Given the record, it is certainly reasonable for the BCNR to afford less weight to this factor.

### 4. Special Qualifications

The final fitness factor considers whether a "medical condition causes loss of qualification for specialized duties." SECNAVINST 1850.4E, Encl. (3), ¶ 3304(a)(4). The BCNR found that Ford "had no special qualification to lose." ECF No. 135 at ARIII 0023.

It is unclear what qualifies as a "special qualification." The SECNAVINST merely provides that specialized duties include aviation, parachuting, and diving qualifications. SECNAVINST 1850.4E, Encl. (3), ¶ 3307(c). In *Kelly*, the service member was considered to have a special qualification as he was a Second Class Navy Diver who had graduated from diving school and had undergone diving-specific training. *Kelly I*, 157 Fed. Cl. at 119, 128. That diving qualification is explicitly a "qualification for specialized duties" covered by the SECNAVINST. By contrast, Ford worked as a human resources officer, which is not a special qualification akin to aviation, parachuting, or diving. ECF No. 135 at ARIII 0018. Ford argues that, despite being an HRO, he "qualified as an individual augmentee and served in that capacity in Djibouti" as well. ECF No. 138-1 at 31. In considering his eligibility to augment, the Navy doctor considered whether Ford could "duck-walk/squat without difficulty or joint pain," "hike

2-5 miles with a 50 lb. Pack," and "jump off the back of a 7 ton truck with gear." ECF 82-2 at AR II 0542. The physician answered in the affirmative for all. *Id*.

Whether being an individual augmentee amounts to a specialized qualification for fitness purposes is uncertain. In any event, this factor alone cannot establish a finding of unfitness and, therefore, establish disability. SECNAVINST 1850.4E, Encl. (3), ¶ 3304(a)(4) ("Members whose medical condition causes loss of qualification for specialized duties . . . will not be the sole basis for a finding of Unfit."). Regardless of whether Ford holds a special qualification or not, the BCNR did not act arbitrarily or capriciously in concluding that this factor did not weigh in favor of unfitness.

Given the BCNR reasonably considered each fitness factor and found Ford was not unfit for duty, and Ford did not sufficiently present medical evidence to the contrary, the BCNR did not act in an arbitrary or capricious manner in concluding that Ford was ineligible for disability retirement under 10 U.S.C. §§ 1201, 1204.[12]

## VI.    Due process did not require an in-person hearing.

Ford next contends that he was denied due process by the BCNR's decision not to hold an in-person hearing in his case. ECF No. 138-1 at 2, 25. The Due Process Clause of the Fifth Amendment "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests . . . ." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). At a minimum, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time in a meaningful manner.'" *Id.* at 333 (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1914)). When a deprivation of life, liberty, or property by adjudication occurs, it must therefore be preceded by a notice and opportunity to be heard "appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).

For its part, the BCNR believes that it need not follow *Eldridge* because it is not making the eligibility determination in the first instance; it is determining if there is an error in Ford's record. ECF No. 135 at ARIII 0002. This assertion is untenable. The Federal Circuit has made clear that a veteran has "a property interest in military disability retirement benefits for purposes of due process." *Kelly III*, 179 Fed. Cl. at 333 (citing *Kelly II*, 69 F.4th at 900). But *Kelly II* did not provide what procedures are needed for such military board decisions to satisfy due process.

After the Federal Circuit's decision in *Kelly II*, Judge Davis thoroughly analyzed the due process requirements relating to in-person hearings before boards for corrections of military records. *Kelly III*, 179 Fed. Cl. at 333–35. To begin, *Flute v. United States* provides that "[t]he denial of a hearing before the [Board does] not per se deprive plaintiff of due process." *Id*. (quoting *Flute v. United States*, 535 F.2d 624, 628 (Ct. Cl. 1976)). *Flute* is binding on this court. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims."). Judge Davis also explained

---

[12] As the court upholds the BCNR's decision regarding Ford's disability eligibility, the court does not address Ford's argument regarding an assignment of a disability rating for his PTSD diagnosis. ECF No. 138-1 at 35–36.

that "[o]ther judges in similar cases" determined that military corrections boards are not required to hold a hearing for claims regarding military disability retirement benefits. *Kelly III*, 179 Fed. Cl. at 334 (citing *Armstrong v. United States*, 205 Ct. Cl. 754, 764 (1974); *Lyons v. United States*, 18 Ct. Cl. 723, 729 (1989)).

Ford alleges that BCNR violated his procedural due process by not holding an in-person hearing for his disability benefits, specifically for his claims regarding PTSD and back pain mitigation. ECF No. 135 at ARIII 0002. Ford argues that his appearance request should not have been denied as "[f]ace-to-face hearings are the rule in government benefit cases pursuant to an *Eldridge* analysis." *Id.*; *see generally Eldridge*, 424 U.S. 319 (finding the lack of a pre-termination evidentiary hearing for Social Security disability benefits did not violate the plaintiff's due process). Ford misinterprets *Eldridge*. *Eldridge* requires a meaningful opportunity to be heard during adjudications involving deprivations of life, liberty, or property. 424 U.S. at 332. While *Eldridge* holds that the norm is an in-person hearing, *Eldridge* does not *mandate* in-person hearings. *Id.* at 348. The BCNR may decline to hold an in-person hearing so long as it provides a written, brief statement explaining the denial that is reasonable. *See Burns v. Marsh*, 820 F.2d 1108, 1110 (9th Cir. 1987) (citing *Flute*, 535 F.2d at 628–29); *see also Lopez-Velazquez v. United States*, 85 Fed. Cl. 114, 135 (2008) (finding that the burden is on the "plaintiff to show that the [BCNR's] denial of an evidentiary hearing was unreasonable").

Indeed, 32 C.F.R. § 723.3(e)(2)–(3) provides that BCNR "may deny an application in executive session if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice" and may deny without a hearing if the reasoning is "in writing and include[s] a brief statement of the grounds for denial." The BCNR explained its denial of an in-person hearing:

> The Board determined that your personal appearance, with or without counsel, would not materially add to its understanding of the issues involved in your case. As such, the Board determined that such an appearance was unnecessary and considered your case based upon the evidence of record . . . . There exists no right to a personal appearance hearing for the correction of a military or naval record based upon an error or injustice pursuant to 10 U.S.C. § 1552.

ECF No. 135 at ARIII 0002. To be clear, the BCNR allowed Ford to extensively brief the issues relevant to his claims.

In addition, this court has held that hearings are not needed when BCNR decisions employ certain procedures, such as listing the materials used to reach a decision and reviewing the applicant's response when making that decision. *Kelly III*, 179 Fed. Cl. at 334–35. As BCNR's twenty-eight-page decision checks both boxes, a hearing was not needed to satisfy due process. *See* ECF No. 135 at ARIII 0001 ("Upon careful review and consideration of all the evidence of record, the Board continued to find insufficient evidence of any material error or injustice in your naval record beyond that already addressed . . . ."). Given the level of detail in the naval record, and given the BCNR noted its reliance on the record in coming to a decision, the BCNR did not deprive Ford of any purported due process rights.

**VII.    Denying extra-record evidence does not preclude effective judicial review.**

    **A.    Evidence in Ford's MJAR not put before the BCNR**

Evidence not presented to the BCNR is typically outside this court's jurisdiction, especially "if the evidence in question was accessible to the plaintiff prior to the agency action." *Murakami v. United States,* 46 Fed. Cl. 734, 736 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). "In reviewing an administrative action, the court generally bases its determination solely on review of the administrative record and will not consider evidence produced for the first time in a court proceeding when such evidence was available during administrative proceedings." *Benton v. United States,* 6 Cl. Ct. 781, 786 (1984). Supplementing the record is therefore limited to when "the omission of extra-record evidence precludes effective judicial review" because "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Murakami,* 46 Fed. Cl. at 735; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

The Government argues that Ford has improperly presented new evidence in his second renewed MJAR. This includes (1) an appendix of eight documents, including new naval instructions, the Kurta Memo, the Vazirani Memo, and information regarding the Humvee rollover and Djibouti City bombing; and (2) a footnote regarding memory recall for trauma survivors. *See* ECF No. 138-2. And Ford now seeks to assert that:

> Trauma survivors can be insistent when remembering past events, usually by remembering additional non-experienced event details. Oulton, Jacenta, et al. Imagining Trauma: Memory Amplification and the role of elaborate cognitions, *Journal of Behavior Therapy and Experimental Psychiatry*. 60:78-86 (2018).

ECF No. 138-1 at 25 n. 5. This was not put before the BCNR and Ford does not provide a reason for these additions.

But the court cannot confidently say that omitting this evidence would preclude effective judicial review. Rather, these merely attempt to give the court context regarding Ford's factual claims. As it is not the court's function to reconsider and reweigh factual evidence, *Heisig*, 719 F.2d at 1157, the court must decline to consider new, contextual evidence. Regardless, Ford has not filed a motion to supplement the record with this evidence, and the court lacks jurisdiction to consider evidence that was accessible to Ford prior to the time of the BCNR's reconsideration. Thus, the court cannot consider the appendix to Ford's second renewed MJAR, ECF No. 138-2, nor can it consider Ford's footnote in his second renewed MJAR, ECF No. 138-1 at 25 n. 5.

    **B.    Motion for discovery to supplement the administrative record**

The court now turns to the motion for discovery to supplement the administrative record that Ford filed after the court heard argument on his renewed MJAR, ECF No. 149.

As mentioned, the court is typically bound to the existing administrative record when presented with motions involving an administrative record—except in exceptional circumstances. *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1379–81 (Fed. Cir.

2009); *Murakami,* 46 Fed. Cl. at 736–738.  When a party seeks to supplement the record with additional discovery, the court considers whether discovery is needed "for effective judicial review" or if the "record cannot be trusted." *Axiom Res. Mgmt.*, 564 F.3d at 1380 (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 457–58 (D.C. Cir. 1994)).  Otherwise, "[i]t is well-settled that this court may consider only the record made before the Board," or else the court risks converting an MJAR's "arbitrary and capricious" review into a de novo review. *Barnick*, 591 F.3d at 1382; *see Murakami,* 46 Fed Cl. at 735; *see also NEQ, LLC v. United States*, 86 Fed. Cl. 592, 593 (2009) (holding the court will not supplement the record or "otherwise add to the record evidence, not previously possessed by the agency, designed supposedly to improve the court's 'understanding' of a case").

Ford filed a motion for discovery to supplement the administrative record on June 26, 2025—after briefing and oral arguments had concluded.  ECF No. 149.  Ford seeks to (1) depose the BCNR's executive director "regarding the process the BCNR used for issuing the decisional document in this case as well as the process generally" and (2) "depose the BCNR staff member who wrote the decisional document to determine which findings of fact were not made by the Board members but were instead added by staff without Board member approval."  ECF No. 149 at 1–2.  Ford contends the BCNR employed an improper "post-decisional fact-finding process" in violation of 32 C.F.R. § 723.3(e).  *Id.* at 2, 4.  In particular, he alleges that Freedom of Information Act responses and *Kelly II*, 69 F.4th 887 both indicate "the decisional document proffered by the BCNR for judicial review was not drafted nor approved by the Board panel members who decided LCDR Ford's case."  ECF No. 149 at 2, 4.

Ford's motion, at minimum, is untimely.  *See Kelly III*, 179 Fed, Cl. at 336 ("The Court, however, is not required to entertain untimely arguments not raised in a party's initial brief, and indeed not raised until after both the close of briefing and oral argument."); *see also Murakami*, 58 Fed. Cl. at 351 n. 3 (denying a request to supplement as the movant had not "shown any basis for supplementing the record at this late stage").

Even assuming this motion had been filed in a timely manner, Ford has not established that the record cannot be trusted, nor that extraordinary circumstances warrant supplementing the record.  32 C.F.R. § 723.3(e) sets out what is required of the BCNR when considering an application, including that "[t]he statement of the grounds for denial, together with all attachments, shall be furnished promptly to the applicant and counsel, who shall also be informed that the name and final vote of each Board member will be furnished or made available upon request."  *Id*. § 723.3(e)(5).

The record shows that panel members decided about three months before the BCNR's written decision was released on January 27, 2025.  *See* ECF No. 135 at ARIII 0001 (providing a "three-member panel of the Board, sitting in executive session, reconsidered [Ford's] application *de novo* on 31 October 2024").  And the record establishes that all three BCNR members voted to deny Ford relief and provided a summary of the reasons for the denial:

> No PA
> Evidence supports he was able to execute all duties as required of a
> LCDR; no indication he was unfit; no evidence he was not
> performing his duties; no indication he requested a waiver for

PRT; no indication his medical condition represented a decided medical risk to himself or others, or imposed unreasonable requirements on the Navy to protect Pet; examined each condition w/ evidence, AO and concluded Pet's referral to DES was not warranted; also based on Board members' years of experience of observations of LCDRs in office environment[.]

*Id.* at ARIII 0028.  These reasons for denying relief reflect what is in the final decision, indicating that the final decision is explaining these rationales, not creating anything new.  The BCNR's Executive Director signed off on that written decision, indicating that written decision had the panel's approval.  *Id.* at ARIII 0027.

## VIII.   Conclusion

For the foregoing reasons, the court **DENIES** Plaintiff's motion for judgment on the administrative record, ECF No. 138, and **DENIES** Plaintiff's motion for discovery to supplement the administrative record, ECF No. 149.  The court thus **GRANTS** the Government's cross-motion for judgment on the administrative record, ECF No. 141.  The Clerk is directed to enter judgment accordingly.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge

24